**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

In re: DAOU SYSTEMS, INC.,
SECURITIES LITIGATION,

———————————————

GREG SPARLING; EUGENE
KRABBENHOFT; PATRICK DE KRUYFF,
Esq.; ROBERT ZARETSKY; ROD
FORD; THOMAS V. HAGMAN;
RICHARD W. WALSH; RICHARD
TORIBIO; PAUL RABIN,
          *Plaintiffs-Appellants,*

               v.

GEORGES DAOU; DANIEL DAOU;
FRED McGEE; ROBERT McNEILL;
JOHN MORAGNE; DAOU SYSTEMS,
INC.,
          *Defendants-Appellees.*

No. 02-56989

D.C. No.
CV-98-01537-
L/CGA

7325

In re: DAOU SYSTEMS, INC.,
SECURITIES LITIGATION,

GREG SPARLING; EUGENE
KRABBENHOFT; PATRICK DE KRUYFF,
Esq.; ROBERT ZARETSKY; ROD
FORD; THOMAS V. HAGMAN;
RICHARD W. WALSH; RICHARD
TORIBIO; PAUL RABIN,
                    *Plaintiffs-Appellees,*

            v.

GEORGES DAOU; DANIEL DAOU;
FRED MCGEE; ROBERT MCNEILL;
JOHN MORAGNE,
                    *Defendants,*

            and

DAOU SYSTEMS, INC.,
                    *Defendant-Appellant.*

No. 02-57018

D.C. No.
CV-98-01537-
L/CGA

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Southern District of California
M. James Lorenz, District Judge, Presiding

Argued and Submitted
February 12, 2004—Pasadena, California

Filed February 2, 2005
Amended June 21, 2005

Before: Betty B. Fletcher, Harry Pregerson, and
Melvin Brunetti, Circuit Judges.

Opinion by Judge Brunetti

**COUNSEL**

Eric A. Isaacson, San Diego, California, for the plaintiffs-appellants-appellees.

Michael P. McCloskey, San Diego, California, for the defendants-appellees-appellants.

**ORDER**

The attached amended opinion is substituted for the original opinion filed on February 2, 2005, slip op. page 1385 and appearing at 397 F.3d 704 (9th Cir. 2005). With these amendments, Daou's petition for panel rehearing is denied and plaintiffs' "Motion to Amend Opinion to Conform with Controlling Precedent" is moot.

## OPINION

BRUNETTI, Circuit Judge:

Plaintiffs, a class of former Daou Systems, Inc. ("Daou") investors who purchased Daou common stock between February 13, 1997 and October 28, 1998, allege that defendants Daou, Chief Executive Officer and Chairman of the Board Georges Daou ("G. Daou"), President and Director Daniel Daou ("D. Daou"), Chief Financial Officer and Senior Vice President Fred McGee, Chief Operating Officer and Executive Vice President Robert McNeill, and Director John Moragne systematically and fraudulently violated the Generally Accepted Accounting Principles ("GAAP") in order to artificially inflate the price of Daou's stock. Plaintiffs also allege that they incurred substantial personal losses due to their respective purchases of Daou stock at fraudulently inflated prices. The district court, on several occasions, determined that plaintiffs had failed to state sufficiently particularized claims under the 1933 Securities Act and the 1934 Exchange Act and thrice granted plaintiffs leave to amend. Plaintiffs now appeal the district court's dismissal of their Third Amended Complaint ("TAC") with prejudice. Defendants also cross-appeal the district court's failure to consider, *sua sponte*, whether to impose sanctions against plaintiffs and plaintiffs' attorneys.

## FACTS[1] AND PROCEEDINGS BELOW

Daou created, implemented, and supported computer networking systems for use in the healthcare field. Beginning with its first public offering in February 1997, Daou represented itself as a technologically astute company able to keep pace with the ever-changing medical field. For seven consec-

---

[1]The following facts are taken from plaintiffs' third amended complaint and will be assumed true for purposes of the within review. *See Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir. 2002).

utive quarters, Daou reported "record" growing revenues and stated that the company's earnings per share ("EPS") had and would exceed market expectations. Daou allegedly touted "spectacular" results and "strong growth" while also reporting successful employee retention as well as an "extremely strong pipeline position."

Plaintiffs contend that Daou fraudulently inflated the price of its stock by reporting revenues before they were earned, in violation of GAAP. The company employed an accounting method known as the percentage-of-completion ("POC") method, which is used primarily to account for progress on long-term projects. Under this method, revenue from these projects could only be recognized based on the percentage of labor costs incurred to date compared to the total estimated labor costs for the project. Plaintiffs allege, however, that defendants would prematurely recognize revenue in contravention of the POC method. For example, plaintiffs allege that defendants systematically, without regard to labor costs incurred or estimated, recognized 20% of the contract revenue immediately upon signing products contracts, 40% of the contract revenue immediately after the equipment to be installed was ordered, and 50%-60% of the contract revenue as soon as the equipment was configured and tested. Plaintiffs contend that because of such artificial inflation of the price of Daou stock, Daou was able to acquire eleven companies, and Daou executives and their respective family members were able to sell nearly 2.5 million shares for a total of $54.67 million in improper proceeds. Plaintiffs also allege that to their detriment they purchased their Daou shares during the class period at artificially inflated prices and that, had they been aware of Daou's true financial results and condition, they would not have purchased their shares, or at least not at the prices paid.

Defendants counter that their method of accounting did not violate GAAP or their own stated policy, as they revealed in various disclosures that

> [c]ontract revenue for the development and imple-
> mentation of network solutions is recognized on the
> percentage-of-completion method with progress to
> completion measured by labor costs incurred to date
> compared to total estimated labor costs. . . . *Reve-
> nues recognized in excess of amounts billed and
> project costs are classified as contract work in prog-
> ress*.

(emphasis added). The district court agreed and determined
that plaintiffs had failed to expose any financial tomfoolery
on the part of Daou in its execution of the POC accounting
method:

> Plaintiffs appear [to] argue that, because there was a
> variance between recognized and earned revenue,
> Defendants must have been engaged in accounting
> fraud. Their allegations that the funds in the work in
> progress account represented improperly recognized
> revenue are conclusory and appear to result from cir-
> cular logic. Plaintiffs simply have not shown that
> recognizing unearned revenue and earmarking it for
> the work in progress account is anything but an exer-
> cise of Defendants' business judgment.

Such failure, the court concluded, proved fatal to plaintiffs'
remaining claims, as, for example, if Daou's statements were
not false and misleading, then defendants did nothing requir-
ing an assessment of their scienter in making them. The court
consequently dismissed plaintiffs' TAC with prejudice, and
this appeal followed.

## DISCUSSION

I.  *Standard of Review*

We review dismissals under Federal Rules of Civil Proce-
dure 9(b) and 12(b)(6) de novo. *Vess v. Ciba-Geigy Corp.*

*USA*, 317 F.3d 1097, 1102 (9th Cir. 2003) (citations omitted). "[W]e accept the plaintiffs' allegations as true and construe them in the light most favorable to plaintiffs." *Gompper*, 298 F.3d at 895 (citations omitted). However, "[c]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *In re VeriFone Sec. Litig.*, 11 F.3d 865, 868 (9th Cir. 1993) (citations omitted). "Dismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment." *Gompper*, 298 F.3d at 898 (citation and internal quotations omitted).

## II. *Federal Securities Law*

Plaintiffs' TAC asserts five claims for relief, alleging (1) violation of section 10(b) and Rule 10b-5 of the 1934 Exchange Act against all defendants; (2) violation of section 20(a) of the 1934 Exchange Act against certain defendants; (3) violation of section 11 of the 1933 Securities Act against certain defendants; (4) violation of section 12(a)(2) of the 1933 Securities Act against certain defendants; and (5) violation of section 15 of the 1933 Securities Act against certain defendants.

### a. *Section 10(b) of the Exchange Act of 1934*

**[1]** Section 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b), makes it unlawful "for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe[.]" SEC Rule 10b-5, promulgated under the authority of section 10(b), in turn, provides:

> It shall be unlawful for any person . . .
>
> (a)  To employ any device, scheme, or artifice to defraud,

(b)   To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c)   To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. The basic elements of a Rule 10b-5 claim, therefore, are: (1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. ___, 125 S.Ct. 1627, 1631 (2005).

**[2]** It is well established that claims brought under Rule 10b-5 and section 10(b) must meet the particularity requirements of Federal Rule of Civil Procedure 9(b). *See Semegen v. Weidner*, 780 F.2d 727, 729, 734-35 (9th Cir. 1985). Rule 9(b) states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."

**[3]** Further, the enactment of the Private Securities Litigation Reform Act ("PSLRA") in 1995 significantly altered pleading requirements in private securities fraud litigation by amending the 1934 Exchange Act to require that a complaint "plead with particularity both falsity and scienter." *Gompper*, 298 F.3d at 895 (quoting *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001)); *see also Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004). A securities fraud complaint must now "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation

regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Gompper*, 298 F.3d at 895 (quoting 15 U.S.C. § 78u-4(b)(1)).

The complaint must also "state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind." *Id.* (quoting 15 U.S.C. § 78u-4(b)(2) (emphasis added in *Gompper*)); *see also In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999) ("*Silicon Graphics*") (facts must come closer to demonstrating intent as opposed to mere motive and opportunity). The stricter standard for pleading scienter naturally results in a stricter standard for pleading falsity, because " 'falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts,' and the two requirements may be combined into a unitary inquiry under the PSLRA." *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1091 (9th Cir. 2002) ("*In re Vantive*") (*quoting Ronconi*, 253 F.3d at 429). Thus, the complaint must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness. *Silicon Graphics*, 183 F.3d at 974.

*Reliance on Confidential Witnesses*

**[4]** Because many of plaintiffs' allegations come from accounts of confidential witnesses, their use in satisfying the PSLRA's standard of particularity must be addressed. This circuit in *Silicon Graphics* cautioned about the use of unnamed sources in stating that "[i]t is not sufficient for a plaintiff's pleadings to set forth a belief that certain unspecified sources will reveal, after appropriate discovery, facts that will validate her claim." *Silicon Graphics*, 183 F.3d at 985. Instead, to meet this particularity requirement for personal sources of information, this circuit has applied the Second Circuit's standard that "personal sources of information relied upon in a complaint should be 'described in the complaint with sufficient particularity to support the probability that a

person in the position occupied by the source would possess the information alleged.' " *Nursing Home*, 380 F.3d at 1233 (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)). Where plaintiffs rely on both confidential witnesses and on other facts, "they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false." *Novak*, 216 F.3d at 314; *see also Silicon Graphics*, 183 F.3d at 985 (complaint should include "adequate corroborating details").

**[5]** The First Circuit has also adopted *Novak*'s approach of "look[ing] at all of the facts alleged to see if they 'provide an adequate basis for believing that the defendants' statements were false.' " *In re Cabletron Sys., Inc.*, 311 F.3d 11, 29 (1st Cir. 2002) (citing *Novak*, 216 F.3d at 314). The First Circuit added that this approach "involves an evaluation, *inter alia*, of the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *Id.* at 29-30.

**[6]** This circuit's approach does not necessarily require a plaintiff to name his or her confidential witnesses. However, this circuit does strictly adhere to the PSLRA's mandate that the complaint "state with particularity all facts on which [a] belief is formed," and in so doing, requires that a plaintiff reveal "the sources of her information." *Silicon Graphics*, 183 F.3d at 985 (citation and internal quotation marks omitted). It is by this circuit's adoption of the Second Circuit's standard for evaluating personal sources of information, augmented by the First Circuit's suggested criteria for assessing reliability of confidential witnesses, that plaintiffs' complaint here should be evaluated. So long as plaintiffs reveal with particularity the sources of their information, the complaint will survive under the PSLRA. Naming sources is unnecessary so long as the sources are described "with sufficient particularity to support the probability that a person in the position occupied by the

source would possess the information alleged" and the complaint contains "adequate corroborating details." *See Nursing Home*, 380 F.3d at 1233 (citation and internal quotation marks omitted); *Silicon Graphics*, 183 F.3d at 985.

**[7]** Plaintiffs here describe the confidential witnesses with a large degree of specificity. Plaintiffs number each witness and describe his or her job description and responsibilities. In some instances, plaintiffs provide the witnesses' exact title and to which Daou executive the witness reported. For example, plaintiffs describe Confidential Witness #6 as follows: "Confidential Witness #6 ("CW6") is a former Daou executive who worked in the Finance Department. CW6 dealt with audit issues, Security and Exchange ("SEC") reporting and budget matters. As such, CW6 was familiar with Daou's process of collecting project cost information. CW6 reported to defendant McGee." Similarly, plaintiffs describe Confidential Witness #9 as follows: "Confidential Witness 9 ("CW9") is a former Daou Regional Vice President of Sales. As Vice President of Sales, CW9 was responsible for reporting weekly or bi-weekly sales information, such as sales status/backlog and forecast/pipeline information, to Daou's Vice Presidents and corporate officers." Given the specificity of plaintiffs' descriptions of their confidential witnesses, we hold that plaintiffs have sufficiently met the PSLRA's requirements for confidential witnesses. We next determine whether plaintiffs have sufficiently pled the elements of a Rule 10b-5 claim in light of the PSLRA's heightened pleading standards.

1. *Material Misrepresentations or Omissions*

**[8]** If "[p]roperly pled, overstating of revenues may state a claim for securities fraud, as under GAAP, 'revenue must be *earned* before it can be recognized.'" *Hockey v. Medhekar*, 30 F. Supp. 2d 1209, 1216 (N.D. Cal. 1998) (quoting *Provenz v. Miller*, 102 F.3d 1478, 1484 (9th Cir. 1996)) (emphasis in original). "To properly state a claim for accounting fraud, plaintiffs must 'plead facts' sufficient to support a conclusion

that [d]efendant [ ] prepared the fraudulent financial statements and that the alleged financial fraud was material." *In re Peerless Systems, Corp. Sec. Litig.*, 182 F. Supp. 2d 982, 991 (S.D. Cal. 2002) (citations omitted) (alterations in original).

Violations of GAAP standards can also provide evidence of scienter. *Id.* (citing *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 203 (1st Cir. 1999)); *see also In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000) ("*In re McKesson*") ("[W]hen significant GAAP violations are described with particularity in the complaint, they may provide powerful indirect evidence of scienter. After all, books do not cook themselves."). To support even a reasonable inference of scienter, much less a strong inference, "the complaint must describe the violations with sufficient particularity; 'a general allegation that the practices at issue resulted in a false report of company earnings is not a sufficiently particular claim of misrepresentation.' " *Greebel*, 194 F.3d at 203-04 (quoting *Gross v. Summa Four, Inc.*, 93 F.3d 987, 996 (1st Cir. 1996), *superseded by statute on other grounds as recognized in Greebel*, 194 F.3d at 197 ("strong" inference rather than "reasonable" inference now required for scienter)).

When pleading irregularities in revenue recognition, plaintiffs should allege "(1) 'such basic details as the approximate amount by which revenues and earnings were overstated'; (2) 'the products involved in the contingent transaction'; (3) 'the dates of any of the transactions'; or (4) 'the identities of any of the customers or [company] employees involved in the transactions.' " *In re McKesson*, 126 F. Supp. 2d at 1273 (quoting *Greebel*, 194 F.3d at 204) (alteration in *McKesson*). Plaintiffs need not allege each of those particular details, *see Greebel*, 194 F.3d at 204, but they must allege enough information so that "a court can discern whether the alleged GAAP violations were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue." *In re McKesson*, 126 F. Supp. 2d at 1273.

Plaintiffs here contend that defendants systematically reported revenue, before it was earned in violation of GAAP. For example, they assert that Daou, "without regard to labor costs incurred or estimated," recognized 20% of the contract revenue immediately upon signing products contracts, 40% of the contract revenue immediately after the equipment to be installed was ordered, and 50%-60% of the contract revenue as soon as the equipment was configured and tested. Moreover, plaintiffs assert that for one contract, the Centura Health project, certain Field Services personnel were told that they would receive $100 each if they would go into Daou's San Diego warehouse, plug in and turn on certain computers, and, in turn, bill eight hours of work. One confidential witness stated that he never received the $100, and when he inquired about the payment, he was told to "forget it ever happened." The only rationale for such occurrence, according to the confidential witness, was so Daou could prematurely recognize revenue on the Centura Health project.

Similar allegations were made in *Gross*, 93 F.3d at 995-96, *superseded by statute on other grounds*. The plaintiff in *Gross* asserted that Summa Four prematurely recognized revenue upon receipt of orders rather than on shipment of products, a practice that, in turn, allowed Summa Four to overstate significantly its revenues and earnings during the class period. *Id.* at 995. Gross substantiated such allegations by highlighting certain statements made by Summa Four executives at a board meeting indicating their intention to recognize $4.7 million in late-quarter earnings from the receipt of newly acquired orders, despite the fact that Summa Four generally required twelve to twenty weeks to fulfill such orders. *Id.* at 995-96. Board minutes also revealed that Summa Four's chief financial officer was working on a new "revenue recognition policy" that was to be "more formalized and somewhat more restrictive" than its previous policy. *Id.* at 996.

Although such assertions gave the court "pause," the court nonetheless held that Gross's complaint had not satisfied Rule

9(b)'s heightened pleading standards. *Id.* "A general allegation that the practices at issue resulted in a false report of company earnings is not a sufficiently particular claim of misrepresentation to satisfy Rule 9(b)." *Id.* (citation and internal brackets omitted). The court determined that Gross had failed to allege any particulars to support his general allegation of inflated earnings through the use of improper accounting methods. "Specifically, he has not alleged the amount of the putative overstatement or the net effect it had on the company's earnings." *Id.* The court cited a number of cases in support of this conclusion, including *Shushany v. Allwaste, Inc.*, 992 F.2d 517, 522 (5th Cir. 1993) (allegation that company had adjusted the accounting of its inventory to inflate revenues and earnings does not sufficiently plead fraud where complaint does not explain, *inter alia*, how the adjustments affected the company's financial statements and whether they were material in light of the company's overall financial position), *Roots Partnership v. Lands' End, Inc.*, 965 F.2d 1411, 1419 (7th Cir. 1992) (allegation that company "failed to establish adequate reserves for its excessive and outdated inventory" does not satisfy Rule 9(b) where investor does not allege "what the reserves were or suggest how great the reserves should have been"), and *Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir. 1994) (fraud pled with sufficient particularity by setting out representations made, what financial figures were given, and what the alleged true financial figures were).

**[9]** The case law indicates, therefore, that although overstatement of revenues in violation of GAAP may support a plaintiff's claim of fraud, the plaintiff must show with particularity how the adjustments affected the company's financial statements and whether they were material in light of the company's overall financial position. The district court here determined that plaintiffs failed to make such a showing, noting that "despite an exhaustive search of the TAC, the Court was unable to locate and identify any allegations quantifying and contrasting the revenue Defendants *actually* recognized

under the POC method and the revenue Defendants *should have* recognized if they had properly applied the POC method" (emphasis in original). "This information," the court stated, "is essential to surviving a motion to dismiss in this context." Moreover, the court noted, "Plaintiffs simply have not shown that recognizing unearned revenue and earmarking it for the work in progress account is anything but an exercise of Defendants' business judgment."

**[10]** Upon independent review of plaintiffs' complaint, however, we find at least some specific allegations of how the adjustments affected the company's financial statements and whether they were material in light of the company's overall financial position. The complaint alleges myriad observations of accounting misfeasance (e.g., alleged manipulation of the books), and at least some of such allegations reveal that the amount of revenue Daou formally recognized was completely unrelated to the amount of labor incurred to date. According to Daou's stated method of revenue recognition—the POC method—Daou was to recognize revenue based on the percentage of labor costs incurred to date compared to the total estimated labor costs for the project. However, plaintiffs allege, and confidential witnesses corroborate, that

> Vice Presidents Ringwall and Mirabile would print out the ManFact reports containing actual labor and percent completion submitted by project managers, for the current month and quarter. According to CW3, CW4, CW7 and CW16, the ManFact data was compiled into a Monthly Project Report which was sent to G. Daou, D. Daou, McGee, and McNeill at the close of each month and quarter. . . . Based on the comprehensive Monthly Project Report. G. Daou, D. Daou, McNeill and McGee would adjust upward the percent of completion for projects.

If plaintiffs can in fact prove such intentional manipulation of the accounting principles, they will have shown that Daou's

public statements regarding recognized revenue were materially misleading.

Moreover, it appears that the district court conflated two accounting concepts, earned revenue and that revenue for which a company was entitled to bill its customers. As stated above, it is a violation of GAAP to recognize revenue before it is earned. *Provenz*, 102 F.3d at 1484. Plaintiffs allege that "defendants recognized millions of dollars in revenue before it was earned and without regard to actual labor costs incurred or total estimated labor costs." Plaintiffs also provided figures allegedly indicating the discrepancy between the revenues Daou recognized and the amount that it was entitled to bill its customers during certain quarters within the class period. Defendants explain that "[r]evenues recognized in excess of amounts billed and project costs are classified as contract work in progress." What defendants' disclosure — that revenue was sometimes being recognized before the customer was billed — does not reveal is that defendants were recognizing revenue *before it was even earned*. An investor would read defendants' disclosure of revenues "recognized" as meaning that the excess revenues recognized were at the very least earned. As plaintiffs allege, that statement was misleading because defendants were allegedly recognizing revenue, before it was earned in violation of GAAP.

Further, systematically recognizing a set amount of revenues before such percentage of labor had been performed and accounting for such premature recognition simply by dumping those amounts in the work-in-progress account could violate other GAAP principles such as "financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions," (citing FASB Statement of Concepts No. 1, ¶ 34), and "financial reporting should be reliable in that it represents what it purports to represent," (citing FASB Statement of Concepts No. 2, ¶¶ 58-59).

Indeed, plaintiffs allege that "[t]he work in progress account was comprised almost entirely of contract amounts Daou had recognized as revenue but for which it was not entitled to bill *because little or no labor had yet taken place . . .*" (emphasis added). If this were the case, then Daou's explanation for its excess revenues may have been misleading if the revenue reported indeed included amounts for which Daou was not entitled to bill *because little or no labor had yet taken place.* In fact, plaintiffs provide one telling example of defendants recognizing revenue before a contract was even signed:

> [D]uring the final weeks of the 3Q97, defendants were desperate to report revenue growth. At the time, according to CW5 [who allegedly had personal knowledge of this project], Daou, led by G. Daou, was in the process of negotiating a multi-million dollar contract with Candler Health Systems. During the final days of 3Q97, all of the equipment for the Candler Health Systems project was ordered and Daou immediately recognized 20% of the contract price, approximately $1-1.5 million, as revenue, before any contract was signed. By the following quarter, after the Candler Health Systems project revenues had been reported, Daou still did not have a contract and had incurred no actual labor costs. Daou never received the contract and eventually was forced to sell the equipment at a loss.

Plaintiffs further describe how this allegedly premature recognition affected Daou's financial bottom line:

> Had Daou reported revenue in line with the amount it was entitled to bill customers pursuant to its contracts, actually reflecting contract work done to date, revenue for 3Q97 would have been only $5.9 million, 48% less than publicly reported ($11.3 million). CW13, CW17, and CW 27 confirmed that the dramatic growth in Daou's work in progress account,

increasing $5.4 million from 2Q97 to 3Q97, was the result of defendants' premature recognition of revenue.

In addition to pleading the approximate amount by which revenues and earnings were overstated, plaintiffs also provide the dates of some of the related transactions and the identities of the customers and the company employees involved in the transactions. For example, as noted above, plaintiffs described an occurrence with the Centura Health project, which allegedly involved several of the confidential witnesses. CW5 indicated that Daou offered him and two other salaried Field Service employees $100 to come into Daou on the last Saturday of June 1997, unpack and plug in computer equipment ordered for the Centura Health project and immediately record eight hours of labor. CW5 alleged that the purpose of this event "was to justify recognizing 30%-40% of the revenue on the Centura Health project in 2Q97." On another occasion, as noted above, CW5 corroborates other evidence that Daou recognized 20% of the contract price — $1 to 1.5 million — on the Candler Health project before the contract was even signed. Notably, plaintiffs allege that Daou never received the Candler Health contract.

[11] From these allegations, we conclude that plaintiffs have provided enough information for "a court [to] discern whether the alleged GAAP violations were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue." *See In re McKesson*, 126 F. Supp. 2d at 1273. Certainly, prematurely recognizing millions of dollars in revenue is not minor or technical in nature. Further, the complaint, although largely repetitive in its assertions, indicates that these practices allegedly occurred systematically throughout the class period. We hold, therefore, that these allegations sufficiently state reasons why the reporting statements were misleading and, as an allegation made on information and belief, the facts on which that belief was formed. *See Gompper*, 298 F.3d at 895. These allegations

include specific descriptions of how Daou allegedly violated GAAP procedures and, in so doing, misled present and potential investors by artificially inflating Daou's revenues above what should have been reported.

[12] Similarly, we hold that plaintiffs' claims regarding employee training and turnover contain sufficient particularity to support a securities fraud claim. Plaintiffs allege that various defendants made statements indicating that Daou instituted a training program called "Daou University," at which Daou employees were taught technical skills and became certified in computer networking languages and programs. Moreover, plaintiffs contend, in May 1998, D. Daou and McGee represented that Daou had an ongoing program with local universities in San Diego whereby Daou brought in college students to Daou University to train them in systems and networking. According to plaintiffs, neither Daou University, nor the company's program with local college students, existed. Plaintiffs further assert that defendants misled potential investors by understating employee turnover and attrition.

The district court concluded that these allegations lacked sufficient particularity to be actionable. As to employee attrition, for example, the district court noted:

> The one allegation of any substance, Plaintiffs' contention that employee attrition was actually 40%, not 6.8% as represented by Defendants, does not establish misrepresentation on Defendants' part. Defendants' statements that attrition among *technical* employees was at 6.8% was made in July 1998, and confidential witnesses' statements that the attrition rate for all employees was at 40% was made in the first quarter of 1998.

However, the complaint itself qualifies the allegation of employee turnover by stating that "[e]mployee turnover, especially among Field Service engineers, exceeded 40%,"

whereas defendants stated that "attrition within the technical ranks of employees was only 6.8%." Such discrepancy between what Daou executives reported and the allegedly true state of affairs of Daou's employ is adequately misleading to state a claim under 10(b).

**[13]** We therefore disagree with the district court that Daou's alleged misleading statements of employee turnover and lack of training were not sufficiently particularized to state a cause of action under the PSLRA's heightened pleading standards. Plaintiffs provide several accounts of confidential witnesses claiming that "Daou University" did not in fact exist and that Daou actually had "no in-house training program whatsoever, and according to CW21, the Company was hiring, among others, untrained mechanics and cable pullers as computer technicians, not college graduates." Unlike *In re Vantive*, where the court held insufficient generic allegations of "inadequate training" or "very high salesforce turnover," *see In re Vantive*, 283 F.3d at 1086-87, the complaint here contains sufficiently detailed allegations of misleading statements or omissions regarding Daou's ability to train and retain its employees to state a claim even under the PSLRA's more rigorous standard.

**[14]** Plaintiffs' allegations regarding Daou's "pipeline" expectations, however, fail to satisfy the PSLRA's requirements. The complaint alleges that Daou misrepresented its "pipeline" expectations, stating that its position was "extremely strong" and "remained healthy and would fuel future earnings growth," that "visibility of future earnings was outstanding," and that the company's "momentum was increasing." Although these projections might have been overly optimistic when made, they do not rise to the level of a material misrepresentation actionable after enactment of the PSLRA:

> Congress enacted the PSLRA to put an end to the practice of pleading "fraud by hindsight." *See e.g.*,

> *Medhekar v. United States Dist. Ct.*, 99 F.3d 325, 328 (9th Cir. 1996) (holding that Congress intended for complaints under the PSLRA to stand or fall based on the actual knowledge of the plaintiffs rather than information produced by the defendants after the action has been filed).

*Silicon Graphics*, 183 F.3d at 988. Under the PSLRA's "safe harbor" provisions, plaintiffs must prove that "forward-looking" statements were made with "actual knowledge" that they were false or misleading. *Id.* at 993 (Browning, J., concurring in part and dissenting in part) (quoting 15 U.S.C. §§ 78u-5(c)(1)(B), 77z-2(c)(1)(B)) (internal quotation marks omitted). Plaintiffs allege that Daou sales executives would hold weekly or bi-weekly conference calls with McNeill on the status or outlook of prospective projects, and, based on these calls, McNeill and assistants would prepare a Pipeline Report. The complaint further asserts that "[t]he Pipeline Report contained the arbitrary determination of future business based on fixed percentages of proposed contracts' value." The complaint describes the method by which Daou would determine and report its potential sales revenue to analysts and the market:

> The "revenue" listed in the report and provided to analysts and the market was, according to CW9, automatically set at 20% of a contract's total value if a Daou salesperson had even met with the prospective client to discuss a deal, 50% if Daou had submitted a deal proposal, 70% if Daou had submitted a formal bid on the deal, 90% if Daou "appeared to have won" but the deal was not formally closed and 100% when the sale was formerly closed. The pipeline figure, despite defendants' representations, did not actually reflect contracts Daou would actually get, and included millions of dollars on projects that Daou had little or no chance of actually doing.

Plaintiffs provide no specific facts, however, to substantiate the speculative claim that Daou had little or no chance of actually obtaining certain contracts. Further, plaintiffs fail to provide sufficient facts to demonstrate that defendants had actual knowledge that these optimistic statements were false and misleading when made. Therefore, we agree with the district court that these claims are not actionable under section 10(b).

In sum, however, we find that plaintiffs adequately pled fraud as to defendants' alleged misuse of the GAAP protocols and alleged misstatements regarding employee training and turnover to survive a motion to dismiss for failure to state a claim.

### 2.   *Scienter*

**[15]** Under the PSLRA's new standard, a securities fraud complaint must "state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind." *Gompper*, 298 F.3d at 895 (citing 15 U.S.C. § 78u-4(b)(2) (emphasis added in *Gompper*)); *see also Silicon Graphics*, 183 F.3d at 974 (facts must come closer to demonstrating intent as opposed to mere motive and opportunity). Thus, the complaint must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness. *See Silicon Graphics*, 183 F.3d at 974. This court considers "whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness." *Nursing Home*, 380 F.3d at 1230 (quoting *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 938 (9th Cir. 2003)). In considering whether a strong inference of scienter has been pled, "the court must consider *all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Gompper*, 298 F.3d at 897 (emphasis in original).

There are several considerations in determining whether the totality of plaintiffs' allegations leads to a strong inference of scienter. General allegations of defendants' "hands-on" management style, their interaction with other officers and employees, their attendance at meetings, and their receipt of unspecified weekly or monthly reports are insufficient. *In re Vantive*, 283 F.3d at 1087. However, specific admissions from top executives that they are involved in every detail of the company and that they monitored portions of the company's database are factors in favor of inferring scienter in light of improper accounting reports. *See Nursing Home*, 380 F.3d at 1234. Moreover, while scienter cannot be established by publishing inaccurate accounting figures, even when in violation of GAAP, *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir. 1994) ("*WOW*"), significant violations of GAAP standards can provide evidence of scienter so long as they are pled with particularity. *In re McKesson*, 126 F. Supp. 2d at 1273; *see also Nursing Home*, 380 F.3d at 1234 ("It is reasonable to infer that the Oracle executives' detail-oriented management style led them to become aware of the allegedly improper revenue recognition of such significant magnitude[.]").

In addition, "the PSLRA neither prohibits nor endorses the pleading of insider trading as evidence of scienter, but requires that the evidence meet the 'strong inference' standard." *Greebel*, 194 F.3d at 197. "Unusual trading or trading at suspicious times or in suspicious amounts by corporate insiders has long been recognized as probative of scienter." *Id.*; *see also Nursing Home*, 380 F.3d at 1231-32 (considering suspicious insider stock sales as evidence toward meeting the "strong inference" standard). At a minimum, however, "the trading must be in a context where defendants have incentives to withhold material, non-public information, and it must be unusual, well beyond the normal patterns of trading by those defendants." *Greebel*, 194 F.3d at 198.

Plaintiffs allege throughout the complaint that defendants G. Daou, D. Daou, McNeill, and McGee personally directed

Daou's recognition of revenue, financial reporting and public statements. They further allege that "[n]ot only were these four defendants the top executives at Daou, but, according to CW23, a former executive assistant to one of the defendants, the Company was run 'top to bottom' by G. Daou and D. Daou, with the assistance of McNeill and McGee." Further, the complaint states that "CW9, a regional Sales Vice President at Daou, confirmed that defendants G. Daou, D. Daou, and McNeill not only made the decision on how much revenue to recognize without regard to any actual percentage of completion, but directed the practice of automatically recognizing revenue upon contract signing and ordering of equipment."

In one example noted above, the complaint describes Daou executives manually adjusting upward POC amounts in what appears to be in violation of GAAP procedure. CW1 confirmed that such practices occurred, and the complaint indicates that G. Daou, D. Daou, McNeill, and "in particular McGee[ ] presented themselves as knowledgeable about all aspects of the Company's finances, including earnings and revenue recognized under POC accounting." Plaintiffs further allege that "[b]ased on the account of numerous witnesses, all of whom were former members of Daou's executive, Accounting, or Field Services staff, defendants not only knew that the Company's reported financial results and earnings forecast were based on fraudulent accounting, but personally directed the violations of Daou's stated accounting policy and GAAP in order to artificially inflate revenues"; and "CW8 . . . and CW3 . . . both confirmed that it was known throughout Daou at this time [2Q97] that G. Daou, D. Daou, and McNeill were engaged in improper revenue recognition . . . ."

[16] These specific allegations of direct involvement in the production of false accounting statements and reports are even more probative of scienter than the allegations involved in *Nursing Home*, where this court stated that the top executives' admittedly detail-oriented management style led to a reason-

able inference that the top executives were aware of significant accounting irregularities. *See Nursing Home*, 380 F.3d at 1234. Indeed, the facts alleged by plaintiffs lead to an even stronger inference: plaintiffs have alleged with specificity that the top executives actually directed the improper revenue recognition in violation of both GAAP and their own accounting practices.

Plaintiffs also cite suspicious corporate acquisitions and insider stock sales to demonstrate defendants' scienter. They assert that these events demonstrate that defendants "had motive to inflate Daou's stock price and perpetuate the fraudulent scheme and course of business complained of . . . ." The complaint notes that during the class period, Daou acquired 11 companies by exchanging over 6.6 million shares of Daou stock. Plaintiffs present a chart that indicates how many Daou shares "saved" by using artificially inflated stock to purchase the 11 companies. For example, for Daou to purchase INTEGREX Systems Corp. in July 1997, Daou exchanged 700,000 shares of Daou stock valued at $11,400,000; they assert that had Daou's stock been properly valued, they would have been forced to use 1,476,403 additional shares to make the INTEGREX purchase. All told, the chart indicates that Daou saved 19,642,865 shares of its stock in the 11 acquisitions by using its overvalued stock.

The complaint also highlights that defendants G. Daou, D. Daou, McGee, McNeill, and Moragne, sold a total of 1,477,718 shares during the class period for a total of $30,512,393, and in so doing, they knowingly "profit[ed] from the fraud." Although plaintiffs note that defendants took advantage of the artificially inflated stock prices, interestingly, defendants did not sell at the height of Daou's stock prices; e.g., of the stock G. Daou sold during the class period, he received a maximum price of $22.86 per share, whereas Daou's stock price peaked at $34.375 in September 1997. Moragne, on the other hand, sold 11,408 shares at the highest price among defendants who sold stock during the class

period, $31.69 per share in November 1997. Despite the fact that defendants did not capitalize on Daou's peak price per share, plaintiffs nonetheless contend that the sales were made at suspicious moments: "the fact that 98% of all insider sales . . . took place on only two trading days (August 15, 1997 and January 29, 1998) is highly suspect and indicative of coordinated selling among defendants." Plaintiffs contend that the sales correspond perfectly with the "huge increase in the price of Daou stock that immediately followed [defendants'] false statements and reports . . . ." Plaintiffs also note that, in addition to the suspicious insider trading by defendants, other Daou executives as well as defendants' family members "dumped" a grand total of 2.5 million shares of Daou stock during the class period at artificially inflated prices. Another chart in the complaint explains the percentage of defendants' sales during the class period compared to their total sales through December 31, 2000. Sales by defendants G. Daou, D. Daou, McNeill and Moragne during the class period represented 100% of their total stock sales as of the end of 2000; only defendant McGee sold stock after the close of the class period.

When considered as a whole, plaintiffs' allegations are sufficient to create a strong inference that all defendants except Moragne acted with at least deliberate recklessness. The complaint relays specific information from actual witnesses, albeit unnamed, that defendants knowingly violated GAAP procedures and present more than mere evidence of a motive and opportunity to commit fraud. Although plaintiffs' allegations of Daou's top-to-bottom management hierarchy, defendants' suspicious stock sales, or the corporate acquisitions *alone* would not likely demonstrate defendants' scienter, these plus the complaint's specific allegations of deliberate accounting misfeasance create a strong inference of scienter. *See Nursing Home*, 380 F.3d at 1234 ("Considered separately, Plaintiffs' allegations may not create a strong inference of scienter. However, . . . [w]e find that the totality of the allegations does create a strong inference that Oracle acted with scienter[.]");

*cf. Silicon Graphics*, 183 F.3d at 988 (holding insufficient the plaintiff's "generic" allegations). Unlike in *Silicon Graphics*, this complaint contains sufficient "particularity" and "incriminating facts" to distinguish the allegations from the countless "fishing expeditions" which the PSLRA was designed to deter. *See Silicon Graphics*, 183 F.3d at 988 (citing H.R. Conf. Rep. No. 104-369, at 37).

**[17]** However, we affirm the district court's dismissal of defendant Moragne as relates to the section 10(b) and Rule 10b-5 claims. The complaint's main allegations to establish scienter against defendant Moragne are suspicious stock sales, and those allegations, as pled in plaintiffs' complaint, do not rise to the level of a strong inference. Importantly, there is nothing to suggest Moragne was involved in the day-to-day operations of Daou, much less heavily involved in the details and personally directing the accounting irregularities. Our affirmance as to Moragne, however, does not imply that suspicious stock sales, by themselves, can never lead to a strong inference. The facts alleged in this complaint simply do not support a strong inference of scienter.

### 3. *Connection with the Purchase or Sale of a Security*

Plaintiffs have sufficiently alleged a connection between the misrepresentations and the purchase or acquisition of Daou common stock.

### 4. *Transaction and Loss Causation*

A court must also consider whether the plaintiff has shown some causal connection between the fraud and the securities transaction in question. *The Ambassador Hotel Co. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1026 (9th Cir. 1999); *Levine v. Diamanthuset, Inc.*, 950 F.2d 1478, 1486 (9th Cir. 1991) ("[P]laintiff must establish a connection between the defendant's alleged misrepresentation and the security at issue."). "Deception related to the value or merit of the securities in

question has sufficient connection to securities transactions to bring the fraud within the scope of § 10(b)." *The Ambassador Hotel*, 189 F.3d at 1026 (citation omitted).

The causation requirement can be broken down into two necessary elements: actual cause ("transaction causation") and proximate cause ("loss causation"):

> [I]n an action brought under Rule 10b-5 for material omissions or misstatements, the plaintiff must prove both transaction causation, that the violations in question caused the plaintiff to engage in the transaction, and loss causation, that the misrepresentations or omissions caused the harm.

*Id.* at 1027 (quoting *Hatrock v. Edward D. Jones & Co.*, 750 F.2d 767, 773 (9th Cir. 1984)). Thus, to prove transaction causation, the plaintiff must show that, but for the fraud, the plaintiff would not have engaged in the transaction at issue; to prove loss causation, the plaintiff must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiff. *Id.*; *see also Dura Pharms.*, 125 S.Ct. at 1633 ("[P]laintiff [must] prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss."). A plaintiff is not required to show "that a misrepresentation was the *sole* reason for the investment's decline in value" in order to establish loss causation. *See Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447 n. 5 (11th Cir. 1997) (emphasis added). "[A]s long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement" but will play a role "in determining recoverable damages." *Id.*

Here, we conclude that plaintiffs have sufficiently demonstrated defendants' fraud, such that the "[d]eception related to the value or merit of the securities in question" creates a suffi-

cient connection to the securities transactions to bring the fraud within the scope of section 10(b). *See id.* at 1026 (citation omitted). Such fraud in disclosing Daou's financial position would likely suffice to prove transaction causation: but for the fraud, plaintiffs would not have engaged in the transaction at issue. *See id.* at 1027.

As the district court pointed out, however, establishing "loss causation" is a more difficult task, as the district court found that Daou's improper use of the POC method was not linked to the decline in Daou's share price. The court stated:

> It is undisputed that Daou's 3Q98 financial results were dismal, and that this led to the precipitous drop in the Company's stock value. However, in the TAC, Plaintiffs have not adequately been able to link the decline in share price to any purported improper revenue recognition by Defendants. Plaintiffs point to the fact that market analysts questioned whether Defendants had been "cooking" Daou's books after the 3Q98 results were revealed, but this is merely speculation. Notably, the TAC does not allege that there were any negative public statements, announcements or disclosures at the time the stock price dropped that Defendants were engaged in improper accounting practices.

In other words, if the improper accounting did not lead to the decrease in Daou's stock price, plaintiffs' reliance on the improper accounting in acquiring the stock would not be sufficiently linked to their damages.

An independent assessment of the TAC, however, indicates that the price of Daou's stock fell precipitously after defendants began to reveal figures showing the company's true financial condition. On August 13, 1998, Daou's stock was trading at $18.50 per share. The TAC alleges that "beginning in August 1998, defendants revealed that Daou's operating

expenses and margins were deteriorating and, on October 28, 1998, defendants revealed that Daou had dramatically missed its projected 3Q98 earnings and would have to report a loss of $0.17 a share." Notably, the TAC alleges that "Defendants further revealed that the Company's rapidly escalating work in progress account represented over $10 million in unbilled receivables—*the direct result of prematurely recognizing revenue*." (emphasis added). Later, the TAC alleges that, prior to the August 13, 1998 disclosure, "[d]efendants failed to disclose the actual figures to analysts to conceal the fact that Daou's operating earnings and margins were deteriorating as a result of prematurely and improperly recognizing revenue." Finally, as the district court also noted, the TAC anonymously quotes an analyst who allegedly stated, "[w]hen you say one thing on the conference call and report something different on the 10-Q, that raises concern . . . . *You have got to question whether they are manufacturing earnings*."

Plaintiffs allege that these disclosures of Daou's true financial health, the result of prematurely recognizing revenue before it was earned, led to a "dramatic, negative effect on the market, causing Daou's stock to decline to $3.25 per share, a staggering 90% drop from the Class Period high of $34.375 *and a $17 per share drop from early August 1998*." (emphasis added). Indeed, the TAC alleges that "[f]ollowing these revelations, defendants conceded that Daou was moving its business practice away from fixed-price contracts with revenue recognized on a percentage of completion basis to charging on a time and expense basis." Finally, the TAC alleges that "Daou's stock price has never recovered and the Company has never been able to match the artificially inflated revenues reported during the Class Period."

We conclude that the foregoing allegations, if assumed true, are sufficient to provide Daou with some indication that the drop in Daou's stock price was causally related to Daou's financial misstatements reflecting its practice of prematurely recognizing revenue before it was earned. *See Dura Pharms.*,

125 S.Ct. at 1634 (requiring "a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind"). We note that, as the TAC currently reads, at the time when Daou began to reveal its true financial health in August 1998, its stock was trading at $18.50 per share and not at the class high of $34.375. The TAC does not allege any revelation of Daou's true financial health prior to August 1998. Thus, as the TAC reads now, any loss suffered between $34.375 and $18.50 cannot be considered causally related to Daou's allegedly fraudulent accounting methods because before the revelations began in August 1998, the true nature of Daou's financial condition had not yet been disclosed.

### 5. *Economic Loss*

Plaintiffs' economic loss was not that they purchased stock at inflated prices; rather, their economic loss was the decline in their stock value that was the direct result of Daou's misrepresentations. *See Dura Pharms.*, 125 S.Ct. at 1631-32. Here, the TAC's assertions of a steep drop in Daou's stock price following the revelation of Daou's true financial situation are sufficient to enable the complaint to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).

### b. *Plaintiffs' 1933 Securities Act section 11 claim*

Unlike section 10(b), section 11 of the 1933 Securities Act creates a private remedy for any purchaser of a security if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). "The plaintiff in a § 11 claim must demonstrate (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." *In re*

*Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1403-04 (9th Cir. 1996) ("*In re Stac*") (citation and internal quotation marks omitted). "No scienter is required for liability under § 11; defendants will be liable for innocent or negligent material misstatements or omissions." *Id.* (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983)).

Although section 11 does not contain an element of fraud, a plaintiff may nonetheless be subject to Rule 9(b)'s particularity mandate if his complaint "sounds in fraud":

> [T]he plaintiff may allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim. In that event, the claim is said to be "grounded in fraud" or to "sound in fraud," and the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b).

*Vess*, 317 F.3d at 1103-04; *see also In re Stac*, 89 F.3d at 1404-05 ("We now clarify that the particularity requirements of Rule 9(b) apply to claims brought under Section 11 [of the 1933 Securities Act] when, as here, they are grounded in fraud.").

In a case where fraud is not an essential element of a claim, only allegations of fraudulent conduct must satisfy the heightened pleading requirements of Rule 9(b). *Vess*, 317 F.3d at 1105. "Allegations of non-fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a)." *Id.* As the Fifth Circuit wrote:

> Where averments of fraud are made in a claim in which fraud is not an element, an inadequate averment of fraud does not mean that no claim has been stated. The proper route is to *disregard* averments of fraud not meeting Rule 9(b)'s standard and then ask whether a claim has been stated.

*Id.* (citing *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 368 (5th Cir. 2001) ("*Lone Star*")) (emphasis added in *Vess*). As the Eighth Circuit elaborated:

> The only consequence of a holding that Rule 9(b) is violated with respect to a § 11 claim would be that any allegations of fraud would be *stripped from the claim.* The allegations of innocent or negligent misrepresentation, which are at the heart of a § 11 claim, would survive.

*Id.* (citing *Carlon v. Thaman* (*In re NationsMart Corp. Sec. Litig.*), 130 F.3d 309, 315 (8th Cir. 1997)) (emphasis added in *Vess*). "Thus, if particular averments of fraud are insufficiently pled under Rule 9(b), a district court should 'disregard' those averments or 'strip' them from the claim. The court should then examine the allegations that remain to determine whether they state a claim." *Id.*

A district court need not rewrite a deficient complaint however. *Lone Star*, 238 F.3d at 368. Rule 9(b) may prove fatal to 1933 Securities Act claims "grounded in fraud" when the complaint makes a "wholesale adoption" of the securities fraud allegations for purposes of the Securities Act claims. *Id.* (citations, internal quotation marks, and emphasis omitted). In such cases,

> a district court is not required to sift through allegations of fraud in search of some "lesser included" claim of strict liability. It may dismiss. If it does so, it should ordinarily accept a proffered amendment that either pleads with the requisite particularity or drops the defective allegations and still states a claim.

*Id.* at 368-69.

Here, plaintiffs' TAC "sounds in fraud." Notably, the first sentence of the complaint introduces the action as one

"brought on behalf of a class of purchasers of Daou Systems, Inc . . . . common stock [during the class period], seeking damages *resulting from a fraudulent scheme and course of business by defendants*, which harmed [such] purchasers." (emphasis added). Thereafter, the complaint goes on to allege myriad misrepresentations made by defendants, of which defendants had full knowledge, which induced plaintiffs' reliance, and which caused plaintiffs damages. The complaint fully incorporates all allegations previously averred in the complaint for purposes of all their claims. Because the complaint makes a "wholesale adoption" of the securities fraud allegations for purposes of the Securities Act claims, this court need not "sift through allegations of fraud in search of some 'lesser included' claim of strict liability"; indeed, plaintiffs here never rely on such conduct as negligence or mistake in stating their claims. *Cf. Vess*, 317 F.3d at 1105-06. Thus, all of plaintiffs' claims, whether including an element of fraud or not, must satisfy the heightened pleading standard set out in Rule 9(b). *See In re Stac*, 89 F.3d at 1404-05.

To survive dismissal, therefore, plaintiffs must demonstrate, with particularity, "(1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." *In re Stac*, 89 F.3d at 1403-04 (citation and internal quotation marks omitted). Here, as discussed above, plaintiffs have shown with sufficient particularity that defendants engaged in materially false revenue reporting in the various statements disclosed during the class period. Thus, plaintiffs' section 11 claims against all defendants, including defendant Moragne, survive dismissal under Rule 12(b)(6).

c. *Plaintiffs' claims under section 12(a)(2)*

Section 12(a)(2) of the 1933 Securities Act imposes civil liability on any person for use of any instrumentality of interstate commerce to offer or sell securities by means of a pro-

spectus or oral communication that includes "an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading . . . ." 15 U.S.C. § 77*l*(a)(2). To establish liability under section 12(a)(2), a plaintiff must allege that the defendants did more than simply urge another to purchase a security; rather, the plaintiff must show that the defendants solicited purchase of the securities for their own financial gain:

> The person who gratuitously urges another to make a particular investment decision is not, in any meaningful sense, requesting value in exchange for his suggestion or seeking the value the titleholder will obtain in exchange for the ultimate sale. The language and purpose of § 12(1) suggest that liability extends only to the person who successfully solicits the purchase, *motivated at least in part by a desire to serve his own financial interests or those of the securities owner*. If he had such a motivation, it is fair to say that the buyer "purchased" the security from him . . . .

*Pinter v. Dahl*, 486 U.S. 622, 647 (1988) (emphasis added).

The purchaser must also demonstrate damages to recover under section 12. Because section 12 provides that a person who sells a security through use of material misstatements or omissions "shall be liable . . . to the person purchasing such security from him . . . [for] the consideration paid for such security with interest thereon, less the amount of any income received thereon, . . . or for damages if he no longer owns the security," 15 U.S.C. § 77*l*(a), there can be no recovery unless the purchaser has suffered a loss. *In re Broderbund/Learning Co. Sec. Litig.*, 294 F.3d 1201, 1205 (9th Cir. 2002). "That is to say, what the purchaser is entitled to is 'a return of the consideration paid, reduced by the amount realized when he sold the security and by any "income received" on the security.' "

*Id.* (citing *Randall v. Loftsgaarden*, 478 U.S. 647, 656 (1986) (citation omitted)). Causation, however, is not a necessary element of a prima facie case under section 12 of the Securities Act. *See Casella v. Webb*, 883 F.2d 805, 808 & n.8 (9th Cir. 1989) (holding that if the alleged misrepresentations are material, a plaintiff is entitled to recovery whether or not the misrepresentations caused the alleged damage).

**[18]** The district court failed to reach the issue of whether Daou and the individual defendants were "directly involved" in the actual solicitation of a securities purchase because it had determined that "Plaintiffs' 12(a)(2) claim necessarily fails for lack of adequate allegations that Defendants made any false or misleading statements or omissions of material fact." Because we hold that plaintiffs adequately averred material misrepresentations on the part of defendants' statements in their various periodic disclosures, the district court must revisit the remaining elements of plaintiffs' section 12(a)(1) claim to determine whether they are sufficient to survive dismissal under Rule 12(b)(6).

d.  *Plaintiffs' claims under sections 15(a) of the 1933 Securities Act and 20(a) of the 1934 Exchange Act*

Section 15(a) of the 1933 Securities Act imposes joint and several liability upon every person who controls any person liable under sections 11 or 12. 15 U.S.C. § 77*o*. Such section provides:

> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77*l* of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the

controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

*Id.*

Similarly, section 20(a) of the 1934 Exchange Act provides:

Every person who, directly or indirectly, controls any person liable under any provision of [chapter 2B] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

**[19]** Because the district court did not find that Daou or the individual defendants had engaged in anything but "an exercise of Defendants' business judgment," it also rejected plaintiffs' contention that defendants should be liable under sections 15(a) or 20(a). Again, because we conclude that plaintiffs have adequately set forth a claim of accounting fraud, the district court must reassess the viability of plaintiffs' sections 15 and 20 claims as well.

## CONCLUSION

Plaintiffs' complaint, although lengthy and often repetitive, states a sufficiently particularized claim for accounting fraud under the heightened pleading standards of the PSLRA. Accordingly, we need not reach plaintiffs' request for leave to amend nor defendants' request for attorney's fees. The case

is remanded to the district court for further proceedings consistent with this opinion. The parties shall bear their own costs.

AFFIRMED in part; REVERSED in part and REMANDED.