### In re NUVELO, INC, SECURITIES LITIGATION.

**This Document Relates to All Actions.**

**No. C 07–4056 VRW.**

United States District Court, N.D. California.

Aug. 17, 2009.

---

Carole A. Broderick, Dennis J. Herman, Barbara A. Podell, Sherrie R. Savett, Barbara A. Podell, Sherrie R. Savett, Berger & Montague, P.C., Phyllis Maza Parker, Philadelphia, PA, Eli Greenstein, Coughlin Stoia Gellar Rudman & Robbins LLP, Scott Devereaux, Cooley Godward LLP, San Francisco, CA, Mario Alba, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, Melville, NY, Nicolette Tropiano, Schiffrin Barroway Topaz & Kessler LLP, Radnor, PA, Jeffrey S. Nobel, Izard Nobel LLP, Nancy A. Kulesa, West Hartford, CT, for Plaintiffs.

Scott Devereaux, Jeffrey Michael Kaban, Cooley Godward Kronish LLP, Palo Alto, CA, for Defendants.

## ORDER

VAUGHN R. WALKER, Chief Judge.

Plaintiffs filed an amended consolidated complaint ("Prior Complaint") alleging violations of federal securities laws on November 9, 2007. Doc. # 31. On December 4, 2008, 2008 WL 5114325, the court granted defendants' motion to dismiss the Prior Complaint ("Prior Order"). Doc. # 69. The Prior Order granted plaintiffs leave to amend. Doc. # 69 at 34–35. Plaintiffs did so on January 23, 2009, filing a second consolidated amended complaint ("SAC"). Doc. # 76. On March 24, 2009, defendants moved to dismiss the SAC. Doc. # 78. This order addresses that motion.

### I

As an initial matter, defendants request judicial notice of 42 documents contained in Jeffrey Kaban's declaration (Doc. # 80, Exhs. A-¶) relating to defendants' motion to dismiss. Doc. # 79. Federal Rule of Evidence 201 allows courts to take judicial notice of matters that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

Plaintiffs do not oppose the court taking judicial notice of exhibits A–GG and LL-¶. Doc. # 91 at 2. Because the request for judicial notice is unopposed as to those documents, and they are either referenced in the SAC or demonstrate information available to the market during the class period, the court takes judicial notice of exhibits A–GG and LL-¶. Doc. # 80. Doc. # 91 at 2–4.

Plaintiffs do, however, oppose defendants' request for judicial notice of exhibits HH–KK. Doc. # 91 at 2. Exhibits HH–KK include a *Pharmaceutical Statistics* journal article (Exh. HH), two Food and Drug Administration ("FDA") publications (Exhs. II, KK) and an FDA Power-Point presentation (Exh. JJ). All four documents relate to a factual dispute relevant to defendants' motion to dismiss:

FDA guidance on the statistical standard required to pass placebo-controlled studies. Plaintiffs argue that "the purported 'facts' that Defendants seek to prove by these documents may not be judicially noticed because they are subject to dispute." Doc. # 91 at 2.

While the court recognizes that the facts described in the four disputed documents are not the proper subject of judicial notice, defendants merely seek judicial notice of the fact that these documents were publicly available during the time the fraud alleged in this action occurred. Doc. # 94 at 2. Courts hearing securities fraud cases routinely take judicial notice of documents with unquestioned authenticity that demonstrate the information available to the market during the class period. See *Construction Laborers Pension Trust of Greater St. Louis v. Neurocrine Biosciences, Inc.,* 2008 WL 2053733, *6, 2008 U.S. Dist LEXIS 38899, *5 (S.D.Cal. May 12, 2008) (taking judicial notice of FDA guidelines because they were "publicly available to a reasonable investor"). These documents may be considered "to establish 'whether and when certain information was provided to the market' not the truth of the matters asserted in the reports." *In re Infonet Servs. Corp. Securities Litigation,* 310 F.Supp.2d 1106, 1116 (C.D.Cal.2003), quoting *In re PetSmart, Inc. Securities Litigation,* 61 F.Supp.2d 982, 987 n. 1 (D.Ariz.1999). Accordingly, the court GRANTS defendants' request for judicial notice of exhibits HH–KK in order to consider the complete record of the defendants' alleged fraudulent statements and omissions in light of the other information available to the market.

## II

In deciding a motion to dismiss, the court must accept all well-pleaded factual allegations in the complaint as true. *Blake v. Dierdorff,* 856 F.2d 1365, 1368 (9th Cir.

1988). Accordingly, the following allegations appear in the SAC. Doc. # 76.

Plaintiffs are a class consisting of all purchasers of the publicly traded securities of defendant Nuvelo between January 5, 2006 and December 8, 2006, inclusive (the "Class Period"). Doc. # 76 at 4. Defendants are a biopharmaceutical company Nuvelo and several of Nuvelo's senior officers and managers: Ted Love, Gary Titus and Michael Levy. Id. at 20–21. The SAC alleges that Nuvelo stock traded at artificially high prices during the Class Period because of fraud by defendants. Id. at 4, 82–83.

Prior to and during the Class Period, Nuvelo was engaged in preclinical and clinical testing of medical drugs. Id. at 4. Nuvelo's "lead product" was a drug called alfimeprase that Nuvelo was testing for its safety and ability to dissolve blood clots. Id. Nuvelo was in the process of testing alfimeprase in order to gain regulatory approval of the drug and to bring it to market. Id.

To gain regulatory approval, the FDA requires that the sponsor of a drug demonstrate that it is safe and effective in three human clinical trials ("phase 1", "phase 2" and "phase 3"). Id. at 28. The FDA does not approve a drug in general, but rather approves a drug for a specific use, or "indication." Id.

In 2003, Nuvelo began conducting clinical trials of alfimeprase for two indications: dissolving blood clots in the legs (PAO) and dissolving blood clots in occluded catheters for patients undergoing treatment (CO). Id. at 24. The FDA approves particular claims of efficacy based on the results of the trials. Id. at 28. So Nuvelo designed its alfimeprase trials to demonstrate particular claims about the drug for the treatment of both PAO and CO.

## A

Nuvelo called its clinical program for CO SONOMA (Speedy Opening of Non-functional Occluded catheters with Mini-dose Alfimeprase). Doc. # 76 at 36. SONOMA's primary endpoint, or the claim Nuvelo was attempting to get approval for, was alfimeprase's ability to clear occluded catheters fifteen minutes after administration of the drug. Id. at 28–29. If Nuvelo could prove that alfimeprase increased blood flow rates of occluded catheters in fifteen minutes, it would gain an advantage over a competing drug—Genentech's Cathflo Activase, which had been proven in clinical trials to increase blood flow rates of catheters in thirty minutes. Id. at 29.

Nuvelo completed the phase 2 trials for CO (SONOMA–1) in 2004. Id. at 37. In a December 2004 press release, Nuvelo reported that one dose of alfimeprase produced cumulative blood flow rates of fifty percent in occluded catheters at fifteen minutes compared to zero percent for Cathflo after fifteen minutes. Id. at 37.

In May 2005, Nuvelo announced its phase 3 clinical trial program for CO. Id. at 38. The program consisted of two phase 3 trials: SONOMA–2 and SONOMA–3. Id. SONOMA–2 was a randomized, double-blind, 300 patient study testing the efficacy of alfimeprase in restoring blood flow to occluded catheters after fifteen minutes. Id. Two-thirds of the patients received alfimeprase and the remainder received a placebo, or a substance having no effect. Id. SONOMA–3 was an 800 patient trial evaluating the safety of alfimeprase. Id.

The success of SONOMA–2 rested on the statistical difference in the restoration of function between the alfimeprase group and the placebo group after fifteen minutes. Id. To gain approval, the FDA requires a statistically significant difference. Doc. # 76 at 29. "Statistically significant" means that a given result is unlikely to

have occurred by random chance or due to factors outside the control of the study. Id. Statistical significance is expressed as a "p-value," which represents a probability that a particular hypothesis tested by a trial happened by chance. Id. Statistical significance consisting of a p-value of less than 0.05 has "traditionally been considered convincing evidence by the FDA." Id. at 29.

The SAC alleges that defendants misled investors by failing to divulge that Nuvelo had an agreement with the FDA that regulatory approval rested on SONOMA–2 achieving a much higher threshold for statistical significance: a p-value of 0.00125. Id. at 38–39. The May 26, 2005 press release announcing the design of the phase 3 CO program stated that the program was "modeled after the Cathflo® Activase® program in this indication." Id. at 54. According to the SAC, this statement and others like it were misleading because the Cathflo Activase trial used the customary p-value of 0.05 as the threshold for statistical significance and investors reasonably expected SONOMA–2 to use the same standard. Id. Defendants' failure to disclose SONOMA–2's more stringent statistical standard misled investors about the likelihood that SONOMA–2 would succeed.

## B

Nuvelo called its clinical trial program for PAO "NAPA" (Novel Arterial Perfusion with Alfimeprase). Doc. # 76 at 31. PAO, also known as "leg attack," involves restricted blood flow in the legs and can be treated by balloon angioplasty, open surgery, catheter based intervention and off-label use of thrombolytic agents. Doc. # 76 at 31. NAPA's primary endpoint was the number of PAO patients treated with alfimeprase who avoid open surgery after 30 days. Id. at 28. If Nuvelo could prove that patients treated with alfimeprase had

a high likelihood of avoiding surgery, alfimeprase could be marketed as a less-invasive and more cost-effective alternative to surgery. Id. at 32.

Nuvelo's phase 2 PAO trial (NAPA–1) was a "safety trial," attempting to demonstrate that administering alfimeprase to PAO patients was safe. Id. at 32. NAPA–1, however, also measured a number of other endpoints, including avoidance of open surgery after 30 days—the endpoint Nuvelo would later attempt to use in phase 3 to gain approval for a claim of efficacy. Doc. # 76 at 32. In the trial, patients received alfimeprase via a side hole catheter inserted through the blood clot. Id. In a January 31, 2006 Prospectus Supplement, relating to a Nuvelo stock offering, defendants touted the results of NAPA–1, stating: "Up to 69% of study patients were able to avoid open vascular surgical intervention in the 30 days following treatment with alfimeprase." Id. at 63.

The SAC alleges that "[a]ccording to a knowledgeable vascular surgeon, it is known among vascular surgeons who use side hole catheters to deliver the Genentech thrombolytic drug as a treatment for PAO, such catheters often break up blood clots that are not too large which restores some native blood flow." Id. at 32. This order refers to the breaking up of blood clots solely due to the insertion of the catheter through the clot, and not due to any drug administered through the catheter, as the "catheter effect." Because there was no placebo group, "the proportion of patients in NAPA–1 who avoided open surgery due to alfimeprase could not be determined accurately due to the [catheter effect]." Doc. # 76 at 33.

The SAC suggests that defendants were aware that a significant catheter effect, and not alfimeprase, may have been responsible for many of the NAPA–1 patients avoiding surgery. Defendants allegedly discussed the catheter effect at company-wide meetings in 2004 or 2005. Id. Moreover, the catheter effect is "perceptible on an angiogram," and defendant Love, a senior officer at Nuvelo, "saw angiograms from NAPA–1." Id. at 32.

Nuvelo's phase 3 PAO trial program, NAPA–2, was designed to test the efficacy of alfimeprase at causing patients to avoid surgery after 30 days. Id. at 33. In order to be sure that the catheter effect was not responsible for patients who avoided surgery, NAPA–2 included both a 300 patient alfimeprase trial and a 300 patient placebo trial. Id. at 33–35. According to a February 27, 2006 Nuvelo press release, "[t]he [phase 3 NAPA] program consist[ed] of two overlapping randomized, double-blind, multinational trials comparing * * * alfimeprase with placebo in total of 600 patients." Id. at 65.

Plaintiffs allege that an undisclosed element of the design of NAPA–2 indicates that defendants believed there was a significant risk that the catheter effect had biased NAPA–1's avoidance of surgery endpoint. Doc. # 76 at 33–35. In the design of NAPA–2, defendants took the "extraordinary measure" of splitting the 300 patient placebo group into two groups—a 38 patient PeriThrombus ("PT") group and a 262 Intra–Thrombus ("IT") group. Doc. # 76 at 33. The IT group received the placebo via a side hole catheter inserted through the blood clot, just as alfimeprase was administered to the alfimeprase group. Id. But the PT group received the placebo via a different kind of catheter inserted near, but not through, the blood clot. Id. at 33–34. Because the placebo was administered to the 38 PT group patients in a way different from alfimeprase-treated patients, the PT group could not be used in the comparison with the alfimeprase trial. Id. "[T]he *only* purpose of [the PT] group was to compare its

results with the [IT] placebo group, to measure the [catheter effect]." Id. at 34 (emphasis in original). According to the SAC, the fact that defendants included the PT group in NAPA–2, without informing the public, reveals that defendants believed there was a much more serious risk that NAPA–2 would fail due to the catheter effect.

## C

According to the SAC, defendants' omissions about the risks of a more stringent target p-value for SONOMA–2, and the catheter effect bias in the results of NAPA–1, rendered multiple statements misleading. All of these statements allegedly misled investors about the likelihood that alfimeprase would succeed in its phase 3 trials, gain regulatory approval and ultimately attain commercial success.

On May 26, 2005, Nuvelo issued a press release announcing its phase 3 alfimeprase program for CO. Doc. # 76 at 53. The press release stated: "The Phase 3 program for alfimeprase in CO is modeled after the Cathflo® Activase® program in this indication." Doc. # 76 at 54. The Cathflo Activase program—unlike SONOMA–2—used the customary 0.05 p-value standard for statistical significance. Id. According to the SAC, drawing comparisons to the Cathflo Activase program without noting the more stringent p-value requirement misled investors about the riskiness of SONOMA–2 in comparison to the Cathflo Activase program. Id. at 54–55.

In a November 1, 2005 conference call with securities analysts and investors, defendant Levy discussed Nuvelo's assumptions about the catheter effect during the PAO phase 2 trial NAPA–1. Id. at 55–57. Levy stated, "our drug is being compared to placebo in Phase 3 pivotal trials, and we expect to see the preponderance of patients avoiding surgery with alfimeprase,

and we expect to see next to no patients being able to avoid surgery with placebo." Id. at 56. Levy also responded to a question about the number of patients likely to avoid surgery in the placebo trial, stating: "we're assuming a relatively low placebo rate. You know if you wanted to guesstimate something in order of 10% or so, you would be approximately right." Id. at 56. The SAC suggests, however, that defendants believed there was a significant risk that the placebo rate was higher than ten percent because the catheter effect would cause many patients to avoid surgery even if they were only administered a placebo.

While Levy disclosed Nuvelo's allegedly fraudulent belief that the catheter effect was low, defendants continued to omit information about the 38 patient PT placebo group. Id. at 56–57. In addition to hiding defendants' concern about the catheter effect, the omission about the 38 patient PT placebo group also allegedly misled investors about the likelihood that the phase 3 PAO program would succeed because the 38 PT placebo group could not be compared to the alfimeprase phase 3 trial given the different catheter delivery mechanism. Doc. # 76 at 57–59. That is to say, because the PT patients received a placebo via a different catheter from the alfimeprase patients, any comparison between those two groups was meaningless. Id. Accordingly, the undisclosed PT group meant that the actual quantity of patients in the placebo group, for purposes of comparison, was only 262. Id.

The SAC alleges other fraudulent statements in 2006—on January 6, January 31, February 27, March 15, April 10, April 24, May 5, July 7 and August 3—but they all essentially repeat the same fraudulent statements alleged in 2005. Id. at 59–73. Each of these statements allegedly misrepresented the risks associated with the phase 3 alfimeprase trials due to the ac-

companying omissions concerning the FDA-agreed p-value for SONOMA–2 and the likely catheter effect biasing the results of NAPA–1.

### D

According to the SAC, just prior to the start of trading on December 11, 2006, Nuvelo revealed that alfimeprase failed to meet its primary endpoints in the phase 3 clinical trials for both PAO and CO. Doc. # 76 at 50. Alfimeprase failed to meet the primary endpoint for the CO treatment, which was to restore blood flow in catheters after 15 minutes demonstrated to a p-value of 0.00125. Id. at 51. Alfimeprase also failed to prevent surgery for 30 days in PAO patients, which was the primary endpoint for the PAO indication. Id. at 50–51. A December 11 press release announced that enrollment in future trials—NAPA–3 and SONOMA–3—had been suspended. Doc. # 76 at 51.

According to the SAC, during a December 11, 2006 conference call, defendants disclosed that alfimeprase failed NAPA–2 and SONOMA–2 due to factors that had been previously undisclosed or downplayed as risks. Doc. # 76 at 40–41. Defendants explained that for PAO, although alfimeprase dissolved some clots, it did not perform significantly better than the placebo group because, as it turns out, the catheter effect dissolved "a substantial number of clots" in both groups. Id. at 40. Defendants Love and Levy "admitted that since none of the Company's prior clinical testing had included the use of a placebo, any past instances of alfimeprase 'dissolving blood clots' was more likely than not simply attributable to the [catheter effect]." Id. For CO, defendant Love revealed that Nuvelo " 'had an agreement with the FDA that the p-value would be far lower than 0.05.' " Id. at 41. Love also stated, " 'While the data from the SONOMA–2 trial show a statistically significant difference in the rate at which alfimeprase and

placebo dissolve clots in venous catheters at 15 minutes, this result did not meet the high threshold established by the FDA for regulatory approval based on only one control trial.' " Id. at 41.

### E

The SAC alleges that defendants' fraudulent statements and omissions described above caused plaintiffs' losses by inflating the price of Nuvelo stock during the Class Period. Doc. # 76 at 82–90. While the SAC does not allege that the price increased following each—or any—of the alleged fraudulent statements, the SAC points to two dramatic changes in price of the stock and attributes them to the alleged fraud. Doc. # 76 at 83.

The first dramatic change in the stock price occurred on January 5, 2006—not coincidentally, the start of the class period. Id. at 45. On January 5, Nuvelo announced it had entered into a "financial alliance" with the pharmaceutical giant Bayer. Id. "The Bayer deal provided a $50 million upfront payment to Nuvelo and included up to $385 million in additional fees and payments." Id. Nuvelo's stock price increased from a previous close of $9.01 to close at $12.67 on January 5—an increase of 41%. Id.

While defendants' alleged fraudulent statements and omissions had been alive in the market for months by the time the Bayer deal was announced, plaintiffs allege that those statements and omissions were still substantially responsible for the dramatic rise in Nuvelo's stock price. Id. at 86. According to the SAC, "[t]he synergistic effect of Defendants' false and misleading statements combined with Defendants' new-found actual ability to fund the testing caused Nuvelo's stock price to skyrocket." Id. This synergy allegedly occurred in two ways. First, "the market recognized" Bayer's involvement with Nu-

velo and alfimeprase as an "endorsement" of the prior false and misleading statements. Doc. # 76 at 86. Second, before the Bayer deal, Nuvelo may not have been able to afford the phase 3 alfimeprase trials; Bayer gave Nuvelo the necessary financial backing to move forward. Id. Accordingly, the SAC alleges that the significant increase in the price of Nuvelo stock that occurred on January 5 was caused in part by defendants' fraudulent statements and omissions about alfimeprase. Doc. # 76 at 86.

The second dramatic change in the stock price occurred on December 11, 2006—the last day of the Class Period—when defendants disclosed that alfimeprase failed the phase 3 trials. Id. at 87. Nuvelo's stock price plummeted from a previous day's close of $19.55 to close at $4.05. Id. at 51. As the SAC describes the December 11 disclosures, "defendants admitted that alfimeprase *had* not worked as represented in the Phase 2 trials, that the Phase 3 trials had failed as a result of risks that had been concealed or downplayed by defendants in a manner that misled investors during the Class Period." Id. at 87 (emphasis in original). By linking defendants' fraudulent statements and omissions to the January 5 rise in the stock price and the December 11 fall in the stock price, plaintiffs allege that their "damages were substantially caused by the scheme to defraud." Id. at 88.

### III

Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b–5 make it unlawful for any person, in connection with the purchase or sale of any security: (1) to engage in fraud, (2) to make an untrue statement regarding a material fact or (3) to make a misleading statement by omitting a material fact. 15 USC § 78j(b); 17 CFR § 240.10b–5. The elements of a Rule 10b–5 claim are: (1) material misrepresentation or omission of fact; (2) scienter; (3)

connection with the purchase or sale of a security; (4) reliance; (5) economic loss and (6) loss causation. *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 341–42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). Claims brought under section 10(b) and Rule 10b–5 must first meet the particularity requirements of FRCP 9(b). *In re Stac Electronics Securities Litigation,* 89 F.3d 1399, 1404 (9th Cir.1996). FRCP 9(b) requires a plaintiff alleging fraud to "set forth what is false or misleading about [the] statement, and why it is false." *In re GlenFed Securities Litigation,* 42 F.3d 1541, 1548 (9th Cir.1994) (superseded by the Private Securities Litigation Reform Act ("PSLRA") on other grounds).

Additionally, a complaint must satisfy the more stringent requirements imposed on securities fraud pleadings by the PSLRA. The PSLRA requires that a complaint: (1) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading" (15 USC § 78u–4(b)(1)); (2) for any such allegations based on information and belief, "state with particularity all facts on which that belief is formed" (15 USC § 78u–4(b)(1)) and (3) "with respect to each act or omission * * * state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" (15 USC § 78u–4(b)(2)). To meet the required state of mind element—scienter—the complaint must allege "that the defendants made the false or misleading statements either intentionally or with deliberate recklessness." *In re Daou Systems Inc.,* 411 F.3d 1006, 1015 (9th Cir.2005), citing *In re Silicon Graphics Securities Litigation,* 183 F.3d 970, 974 (9th Cir.1999).

As noted above, the Prior Order dismissed the Prior Complaint on December 4, 2008. Doc. # 69. The court based dismissal on three grounds: (1) Nuvelo failed

adequately to plead loss causation because there were no allegations to support the fact that the changes in the price of Nuvelo stock resulted from defendants' fraudulent statements or omissions (Id. at 6–17); (2) the alleged fraudulent statements and omissions were not misleading (Doc. # 69 at 17–32); (3) some of the alleged fraudulent statements and omissions were protected by the PLSRA safe harbor for forward looking statements (Id. at 32–34). Defendants argue that none of these maladies has been cured in the SAC and also that the SAC fails to allege scienter. This order addresses these four issues in turn.

## A

■ The loss causation element of a securities fraud action requires "a causal connection between the material misrepresentation and the loss." *Dura Pharmaceuticals v. Broudo*, 544 U.S. 336, 342, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). "[A]s long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate. This is not 'a probability requirement * * * it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of' loss causation." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir.2008), quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

In the Prior Order, the court dismissed the Prior Complaint, in part, because plaintiffs failed to link the alleged fraudulent statements and omissions to changes in the price of Nuvelo stock. While plaintiffs devoted many pages of the Prior Complaint to a discussion of events prior to the start of the Class Period, the only alleged material fraudulent statements and omissions occurred during the Class Period. Doc. # 69 at 10. The court analyzed Nuvelo's stock price before and after each of the alleged fraudulent statements and

omissions and found that the stock price did not appear to respond in a material way to any of the alleged misstatements or omissions. Id. at 11. Additionally, the alleged fraudulent statements consisted mostly of information that was already known to the market before the Class Period began. Id. at 13. The court found that "[b]ecause the complaint does not allege the relationship between the defendants' alleged misstatements about phase 2 studies and the plaintiffs' loss" it failed to plead loss causation. Doc. # 69 at 14.

Defendants argue that the loss causation deficiencies pointed out in the Prior Order persist in the SAC. Defendants cite language from the Prior Order stating "[t]he period of the alleged price distortion and the class period in an open market securities fraud action must coincide," Doc. # 78, quoting Doc. # 69 at 10, in arguing that the court should dismiss the SAC. It appears, however, that the court's prior statement was incomplete. While loss causation is easier to allege if the stock price reacts immediately to the alleged fraudulent statements or omissions in a fraud on the market claim, there appear to be cases in which the reaction of the stock price may not coincide, and thus the Class Period may not coincide with the false or misleading statement. For example, in *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049 (9th Cir.2008), the Ninth Circuit found that loss causation remained plausible despite a "limited temporal gap" between a disclosure correcting an alleged fraudulent statement and the ensuing decrease in stock value. 536 F.3d at 1058. *In re Gilead* found that the corrective disclosure might plausibly have only affected the stock price after subsequent events (negative economic data) made the corrective disclosure's significance more apparent to the public. 536 F.3d at 1058. This lag effect, according to the Ninth Circuit, did

not per se render loss causation implausible. *Id.*

The SAC contains sufficient new allegations that, if taken as true, demonstrate loss causation. Plaintiffs now allege that the fraud on the market began on May 26, 2005—several months prior to the start of the Class Period—and that the stock price did not respond until January 5, 2006, the date of the Bayer deal. Doc. # 76 at 53. The SAC alleges that the stock price increased on January 5 due to "[t]he synergistic effect of Defendants' false and misleading statements combined with Defendants' new-found actual ability to fund the testing caused Nuvelo's stock price to skyrocket." Id. This new allegation of a synergy between the Bayer deal and the previous fraudulent statements and omissions arguably renders the SAC's loss causation allegations plausible—at least for pleading purposes. Id. If, prior to the Bayer deal, Nuvelo did not have the financial ability to fund phase 3 trials for alfimeprase, then investors might have ignored Nuvelo's statements concerning the phase 2 trials. The financial support provided by the Bayer deal on January 5 may have therefore added new significance to defendants prior fraudulent statements and omissions.

Additionally, defendants argue that the SAC fails to link sufficiently the drop in the stock price on December 11, 2006 to the alleged fraud. Doc. # 78 at 30–31. The Ninth Circuit has held that "[a]s long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement but will play a role in determining recoverable damages." *In re Daou Systems Inc.,* 411 F.3d 1006, 1025 (9th Cir. 2005). Defendants argue that December 11, 2006 was not only the date that defendants corrected previous alleged fraudulent statements and omissions, but it was also the date the market learned that alfimeprase failed phase 3 trials. Doc. # 78 at 30. According to defendants, the SAC fails to allege that the correction of the fraud, rather than the failure of the trials, substantially caused plaintiffs' losses by causing the stock price to plummet. Doc. # 78 at 30–31.

The SAC alleges that "[h]ad defendants corrected their false statements and made meaningful disclosure of the risks prior to or during the Class Period, Nuvelo's securities would not have traded as high as they did during the Class Period, or would have declined sooner than they did following the end of the Class Period." Doc. # 76 at 83. The SAC alleges that defendants concealed their knowledge—not that the phase 3 trials would certainly fail—but that they included significant undisclosed risks. The disclosures on December 11 that the trials failed, therefore, revealed to the market not only the concealed risks of the trials but also that those risks had led to the failure of the trials. The drop in the stock price can be attributed in part to both disclosures. And, as defendants argue, it is not clear on the face of the SAC the exact amount to apportion to each of these disclosures.

But, at this stage, plaintiff's allegations are sufficient. The SAC alleges that "a substantial part of the inflation" of the stock price eliminated on December 11 was the result of the corrected fraud. Doc. # 76 at 87. This together with the allegations about the synergistic Bayer deal plausibly suggest that a substantial portion of plaintiffs' losses on Nuvelo stock were the result of the alleged fraudulent statements and omissions.

## B

The Prior Complaint contained similar allegations to those of the SAC about the defendants' fraudulent statements and

omissions. See Doc. # 31. Both complaints alleged that defendants omitted or downplayed risks that NAPA–2 was likely to fail because the catheter effect inflated previous results in NAPA–1 about restored blood flow in patients. Compare Doc. # 76 at 44, with Doc. # 31 at 27. Both complaints also alleged that defendants omitted or downplayed risks that SONOMA–2 was likely to fail due to the agreement between Nuvelo and the FDA that to gain approval alfimeprase would have to achieve a more stringent p-value than the traditional measure. Compare Doc. # 76 at 42, with Doc. # 31 at 22. Finally, both complaints allege that defendants omitted to disclose a secret target p-value that they required SONOMA–2 to achieve in order to ensure that alfimeprase would be commercially viable. Compare Doc. # 76 at 18, with Doc. # 31 at 24–25. The SAC alleges facts to bolster the allegations about the undisclosed risks of the catheter effect and the more stringent p-value, but the allegations about the undisclosed target product profile remain inadequate to constitute a plausible securities fraud allegation.

1

██ The Prior Order found that the Prior Complaint failed to allege that omissions about the catheter effect on the results of the PAO trials were misleading. Doc. # 69 at 22–24. The Prior Order found that defendants' disclosure that they assumed ten percent of patients who received a placebo would avoid surgery was not misleading because the market was aware of uncertainty related to assumptions and there were no allegations that defendants *knew* the catheter effect would cause any more than ten percent of placebo patients to avoid surgery. Id.

The SAC contains two new allegations relevant to the alleged fraudulent statements and omissions about the catheter effect. The SAC alleges that defendant Love had access to information during the phase 2 PAO trial, NAPA–1, indicating whether patient blood clots were broken up by a catheter effect. Doc. # 76 at 32. Specifically, the SAC alleges that Love "told analysts he saw angiograms from NAPA–1" and that "[t]he appearance on an angiogram of a clot broken up by a catheter is different than that of a clot dissolved by a[ ] drug." Id. Additionally, the SAC alleges that defendants took an "extraordinary measure" and designed NAPA–2 to contain a secret group of thirty-eight patients who were administered alfimeprase via a PT catheter that was solely included in the phase 3 program to test the catheter effect. Id. at 33–34.

Defendants argue that these new allegations are insufficient because the SAC still does not allege that defendants omitted to disclose a *known* risk that the catheter effect was likely to cause the PAO phase 3 trial to fail. Doc. # 78 at 18–19. Defendants argue that "[t]here is no basis to conclude that Defendants included the [PT] group because they were concerned that the catheter, as opposed to alfimeprase, was disrupting the clot in a material number of patients." Doc. # 78 at 19. Defendants then list a number of other reasons defendants may have included the PT group. Id.

While it is true that there may be explanations for the PT group other than defendants' knowledge of a significant and undisclosed catheter effect, at this stage, plaintiffs' allegations need only be plausible. The allegation about defendant Love's access to information about the catheter effect during NAPA–1, together with the alleged "extraordinary measure" of including a secret PT group in the placebo group of NAPA–2, carries the SAC's allegations beyond the threshold of plausibility.

2

Regarding the undisclosed stringent p-value for SONOMA–2, the Prior Order found that the alleged fraudulent statements and omissions in the Prior Complaint were not misleading. The court found that the Prior Complaint failed to account for the difference between a phase 3 program that seeks FDA approval based on one placebo-controlled study and a program that seeks approval based on two placebo-controlled studies. Id. at 26. Defendants' failure to disclose that they had a target p-value for SONOMA–2 of 0.00125 was not misleading, according to the Prior Order, because a reasonable investor would have been aware of FDA guidance on the subject, which requires a more stringent p-value when a drug company seeks approval based on a single trial. Doc. # 69 at 26.

The SAC does not ignore the relationship between the number of placebo-controlled trials and the p-value, as did the Prior Complaint. Instead, the SAC alleges that defendants misled investors by failing to disclose that Nuvelo sought regulatory approval based on one trial at a stringent p-value rather than two trials at a more lenient p-value. The SAC alleges that defendants statements that SONOMA–2 was modeled after the Genentech Activase trial and that the phase 3 program for CO consisted of two pivotal trials were materially false and misleading because defendants failed to disclose that the p-value for SONOMA–2 was below the "traditional" standard used in the Genentech Activase trial of 0.05. Doc. # 76 at 53, 54, 66, 68.

Defendants respond that the market was aware that the p-value for SONOMA–2 was below 0.05. Doc. # 78 at 22–23. Defendants disclosed that their phase 3 program for CO consisted of one placebo-controlled trial (SONOMA–2) and one open-label single arm study (SONOMA–3).

Doc. # 76 at 53–54. According to defendants, the market must have realized that because "Nuvelo was not conducting a second placebo-controlled study," that SONOMA–2 would have to follow FDA Guidance to substantiate a single study and achieve "'a very low p-value.'" Doc. # 78 at 23, quoting Doc. # 80–41, Exh. II at 19.

Defendants' argument about market knowledge relies on publications by the FDA demonstrating that a single trial "very low p-value" phase 3 program would be appropriate for the CO indication of alfimeprase. FDA guidance, however, is not clear on the subject. The FDA publication *Guidance for Industry: Providing Clinical Evidence of Effectiveness for Human Drug and Biological Products* (1998) ("FDA Guidance"), Doc. # 80–41, Exh. II, states that FDA approval based on a single study is limited. The FDA Guidance states that the FDA has relied on a single study "generally only in cases in which a single multicenter study of excellent design provided highly reliable and statistically strong evidence of an important clinical benefit, such as an effect on survival, and a confirmatory study would have been difficult to conduct on ethical grounds." Id. at 7. The FDA Guidance also states that "reliance on only a single study will generally be limited to situations in which a trial has demonstrated a clinically meaningful effect on mortality, irreversible morbidity, or prevention of a disease with potentially serious outcome and confirmation of the result in a second trial would be practically or ethically impossible. Id. at 17. Because SONOMA–2 tested the ability of alfimeprase to restore blood flow in occluded catheters—rather than to treat a serious illness or life-threatening condition—it is plausible that investors did not believe that FDA would approve alfimeprase based on a single, "very low p-value," trial.

Defendants also argue that plaintiffs fail to allege with particularity that "Defendants knew that the trial would not meet the p-value and would cause phase [3] trials for CO and PAO to fail." Doc. # 78 at 24. As defendants point out, " 'the fact that a prediction proves to be wrong in hindsight does not render the statement untrue when made.' " Doc. # 78 at 24, quoting *In re Syntex Corp. Securities Litigation,* 95 F.3d 922, 929 (9th Cir.1996).

But the SAC need not allege that defendants knew SONOMA–2 would fail; the SAC need merely allege that defendants misled investors by omitting to disclose a material *risk* that SONOMA–2 would fail. If concealing the target p-value during the Class Period had the effect of substantially inflating the price of Nuvelo stock, then knowledge of the undisclosed risk is the subject of the material fraudulent statement or omission—not knowledge that the trial would surely fail. It is unclear whether plaintiffs will be able to meet a higher evidentiary standard to show that the undisclosed p-value had an effect on the stock price, but taking plaintiffs' allegations as true, the alleged fraudulent statements and omissions about the agreement with the FDA on a 0.00125 p-value survive defendants' motion to dismiss.

### 3

The SAC also alleges that defendants omitted to disclose a "secret product profile" that defendants believed was necessary for alfimeprase to meet in order to be a "commercial success." Doc. # 76 at 18. The SAC alleged that this secret product profile was more stringent than the standard for FDA approval and consequently, and unbeknownst to investors, rendered commercialization of alfimeprase even less likely.

Prior Complaint alleged a similar omission to disclose a secret product profile and the court found it to be not misleading. The Prior Order stated that "the risk that a product may receive federal approval but not the marketplace's acceptance should be obvious. Plaintiffs do not explain how defendants 'affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed].' " Doc. # 69 at 30, quoting *Brody. v. Transitional Hospitals Corp.,* 280 F.3d 997, 1006 (9th Cir. 2002). The SAC does not cure this defect. Accordingly, the SAC's allegations about the omission to disclose the secret product profile are DISMISSED for failure to state a claim.

### C

■ Defendants also argue that the SAC, like the Prior Complaint, alleges fraud for "forward-looking statements," which are not actionable when accompanied by cautionary language under the PLSRA safe harbor provision. Doc. # 78 at 29–30. The PLSRA defines forward-looking statements as including "a projection of revenues," "plans and objectives of management" and "assumptions underlying or relating to" the above. 15 USC § 78u–5(i)(1)(A)–(D). A defendant "shall not be liable" with respect to any forward-looking statement that is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 USC § 78u–5(c)(1). The Prior Order found that the Prior Complaint's alleged fraudulent statements about alfimeprase's "path to regulatory approval" and potential for "transformative" commercial success were shielded by the PLSRA safe harbor provision. Doc. # 69 at 32.

The SAC does not allege that defendants' optimistic statements about alfimeprase's path to regulatory approval or

commercial success are the fraudulent statements giving rise to liability. Rather, the SAC focuses on known present risks about the interpretation of the phase 2 results and the design of phase 3. These statements were not allegedly misleading because they failed to predict the future, but because they concealed or downplayed known present risks related to regulatory approval. Accordingly, the PLSRA does not shield defendants from liability for the alleged fraudulent statements in the SAC.

### D

Defendants also argue that the SAC's allegations fail to create a strong inference of scienter. Doc. # 78 at 28. Defendants state that the "far more compelling and cogent inference to be drawn from the allegations in the SAC and the materials subject to judicial notice is that Defendants were *not* engaged in fraud." Id. at 28 (emphasis in original). Defendants rely on the facts that "[d]rug development is an inherently risky venture" and that "Plaintiffs do not claim that Defendants knew the trials would not succeed." Id. Defendants also emphasize that there are no allegations that defendants sold their stock at the alleged inflated prices during the Class Period and that Bayer invested in Nuvelo after, one would think, extensive due diligence. Id. at 28–29. According to the stock records, only one of the individual defendants sold any stock during the Class Period and one of the individual defendants purchased stock during the Class Period. Doc. # 80, Exh. CC–FF.

As the Ninth Circuit has held, in securities cases falsity and scienter "are generally strongly inferred from the same set of facts and the two requirements may be combined into a unitary inquiry under the PLSRA." *In re Vantive Corp. Securities Litigation,* 283 F.3d 1079, 1091 (9th Cir. 2002) (internal citations omitted). The discussion of the allegedly misleading nature of the fraudulent statements and omissions described above demonstrates that, when the allegations in the complaint are taken as true, the SAC satisfies the scienter element. As described above, the SAC does not allege that defendants knew the alfimeprase phase 3 trials would fail; the SAC alleges that defendants concealed known risks of failure that, if disclosed, would have reduced the price of Nuvelo's stock to account for the greater risk of failure. As another district court has held, "[t]here is nothing wrong with taking a calculated risk. However, if, as Plaintiffs allege, Defendants misled Plaintiffs about such risk by making assurances * * *, Defendants may be held liable." *In re Amylin Pharmaceuticals Securities Litigation,* 2003 WL 21500525, at *5 (S.D.Cal. 2003).

### IV

Based on the foregoing, the SAC satisfies the heightened pleading standards of the PSLRA in all but one respect. The alleged fraudulent omission about the secret product profile are not misleading under the same reasoning articulated in the Prior Order. The other alleged fraudulent statements and omissions, however, when taken as true, survive defendants motion to dismiss. Accordingly, defendants' motion to dismiss (Doc. # 78) is GRANTED IN PART and DENIED IN PART.

The parties shall meet and confer about a discovery and pretrial preparation schedule and contact the courtroom deputy to arrange a case management conference to be scheduled within sixty days of the entry of this order.

IT IS SO ORDERED.