**Nelda ZAMIR, Individually and on Behalf of All Others Similarly Situated, Plaintiff,**

v.

**BRIDGEPOINT EDUCATION, INC., et al., Defendants.**

**Case No.: 15–CV–408 JLS (DHB)**

United States District Court, S.D. California.

Signed 04/05/2017

Casey Edwards Sadler, Lionel Z. Glancy, Robert Vincent Prongay, Glancy Prongay & Murray LLP, Laurence M. Rosen, The Rosen Law Firm, P.A., Los Angeles, CA, Sara Fuks, The Rosen Law Firm, New York, NY, for Plaintiff.

Daniel John Tyukody, Jr., Greenberg Traurig, LLP, Teodora E. Manolova, Goodwin Procter LLP, Los Angeles, CA, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

### (ECF No. 58)

Hon. Janis L. Sammartino, United States District Judge

Presently before the Court is Defendants Bridgepoint Education, Inc., Andrew S. Clark, and Daniel J. Devine's (collectively, "Defendants") Motion to Dismiss Plaintiffs' Second Amended Class Action Complaint ("MTD," ECF No. 58). Also before the Court are Lead Plaintiffs' Response in Opposition to, ("Opp'n," ECF No. 61), and Defendants' Reply in Support of, ("Reply," ECF No. 63), Defendants' MTD. The Court vacated the hearing and took this matter under submission without oral argument pursuant to Civil Local Rule 7.1(d)(1). (ECF No. 62.) Having considered the parties' arguments and the law, the Court **GRANTS** Defendants' MTD.

## BACKGROUND

### I. The Defendants

Defendant Bridgepoint provides for-profit higher education through two wholly-owned subsidiaries, Ashford University and the University of the Rockies. (Second Am. Class Action Compl. ("SAC") ¶¶ 3, 24, ECF No. 57.) Its common stock is publicly traded on the New York Stock Exchange. (*Id.* ¶ 24.)

Defendant Clark is a co-founder of Defendant Bridgepoint, as well as its Chief Executive Officer, President, and a director. (*Id.* ¶ 25.) Defendant Devine served as Defendant Bridgepoint's Chief Financial Officer since January 2004 and its Executive Vice President since January 2011, resigning both positions on October 1, 2015. (*Id.* ¶ 27.)

## II. Factual Background

Defendant Bridgepoint's primary source of revenue is tuition and related fees. (*Id.* ¶ 3.) Without federal financial aid, many of Defendant Bridgepoint's students would not choose to attend Bridgepoint's institutions, nor could they pay the tuition these institutions charge. (*Id.* ¶ 35.)

In mid–2012, Defendant Bridgepoint experienced technical issues during an annual upgrade of its student management system. (*Id.* ¶ 62.) These technical issues resulted in delays in packaging students for financial aid qualification in between financial aid award years. (*Id.* ¶ 63.) As a result, a significant number of students were not packaged prior to leaving Defendant Bridgepoint's institutions and were consequently not eligible for financial aid funding. (*Id.* ¶ 64.) These students were therefore required to pay outstanding balances without the assistance of financial aid. (*Id.*)

On March 12, 2013, Defendant Bridgepoint reported an increase in its bad debt expense for the fourth quarter of 2012 and the 2012 fiscal year. (*Id.* ¶ 97.) Defendant Devine explained to investors and analysts on an earnings conference call that Defendant Bridgepoint's technical issues were to blame, but that he did not expect the issue to repeat in 2013. (*Id.* ¶¶ 63, 97.) On May 17, 2013, Defendant Bridgepoint issued an amended Form 10–K for the 2012 fiscal year to reissue its financial statements. (*Id.* ¶ 67.)

Despite Defendant Bridgepoint's assurances to the contrary, the 2012 technical issues caused a backlog in packaging financial aid throughout 2013. (*Id.* ¶¶ 63, 97.) Consequently, Defendant Bridgepoint continued to report higher than normal bad debt expenses as a percentage of revenues. (*Id.* ¶¶ 11, 98.)

On December 11, 2013, the United States Securities and Exchange Commission (SEC) contacted Defendant Devine with comments and questions regarding Defendant Bridgepoint's declining enrollments but increased revenue for the 2012 fiscal year. (*Id.* ¶¶ 47, 65.) The SEC also asked Defendant Devine how Defendant Bridgepoint's internal processing issues with financial aid packages had affected its bad debt percentage. (*Id.* ¶ 65.) Defendant Devine's January 10, 2014 response detailed Defendant Bridgepoint's 2012 technical issues and the backlog affecting financial aid packaging through 2013. (*Id.* ¶ 65.) In response to the SEC's inquiry regarding Defendant Bridgepoint's determination that collectability is reasonably assured, Defendant Devine noted that Defendant Bridgepoint "conclude[s its] collectability assessment based on the government's ability to pay as opposed to a student's ability to pay." (*Id.* ¶ 45 (emphasis omitted).) Defendant Devine's response prompted the SEC to ask for additional information on February 12, 2014, including "why it is appropriate to base your collectability assessment on the government's ability to pay." (*Id.* ¶ 48.)

On March 11, 2014, Defendant Bridgepoint preliminarily announced its fourth quarter and 2013 fiscal year financial results in a press release. (*Id.* ¶ 120.) Later that day, Defendants held an earnings call, during which Defendants Clark and Devine fielded questions relating to Defendant Bridgepoint's increased bad debt percentage for the quarter. (*Id.* ¶ 121.) Following this news, the price of Defen-

dant Bridgepoint's stock fell 15.73%, or $2.99 per share, closing at $16.02 per share following unusually heavy trading volume. (*Id.* ¶ 122.)

On May 12, 2014, Defendants announced in a press release attached to a Form 8–K that Defendant Bridgepoint would be unable to timely file its Form 10–Q for the first quarter of 2014 because "[t]he Company is working to quantify the impact of an outstanding comment the Company received from the [SEC]." (*Id.* ¶¶ 36, 124.) Defendants also explained that Defendant Bridgepoint was evaluating whether to restate its financial results for the periods from January 1, 2011 through December 31, 2013. (*Id.*) Defendants Clark and Devine held an earnings conference call later that day, during which Defendant Devine admitted that Defendant Bridgepoint's prior revenue recognition policy was incorrect. (*Id.* ¶ 125.) Specifically, Defendant Devine explained that

> [u]nder previous revenue recognition, revenues recognized subsequent to a student losing financial aid eligibility, and ultimately not collected, were included in our bad debt expense. Going forward, our policy will exclude these revenues and will result in a corresponding decrease in our bad debt expense that will be realized over subsequent quarters.

(*Id.* ¶ 37.) Consequently, the price of Defendant Bridgepoint's shares declined nearly 9%, closing at $14.51 per share after unusually heavy trading volume. (*Id.* ¶ 127.)

The following day, Defendant Devine filed a notification of late filing for the first quarter of 2014 on Form 12b–25 with the SEC. (*Id.* ¶ 126.) This resulted in an additional decline of 3.17% in Defendant Bridgepoint's share price, which closed at $14.05 per share. (*Id.* ¶ 127.)

On May 30, 2014, Defendants announced that they were restating Defendant Bridgepoint's financial results for the fiscal year ending December 31, 2013 and each of the three quarterly financial results during the year, as well as revising the financial statements for the fiscal years ending in December 31, 2012 and 2011. (*Id.* ¶¶ 13, 128–29.) On June 2, 2014, the first trading day following the press release, the price of Defendant Bridgepoint's shares declined by 1.31%, or $0.17 per share, closing at $12.82. (*Id.* ¶¶ 14, 130.) Defendant Bridgepoint issued its restated 2013 financials on August 4, 2014. (*Id.* ¶¶ 4, 38.)

As a result of the restatement, Defendant Bridgepoint saw a decrease in revenues, but a corresponding increase in net income and decrease in its bad debt expense:

| Financial Period | Original Revenue (millions) | Restated Revenue (millions) | Difference in Revenue | Original Bad Debt Expense (millions) | Restated Bad Debt Expense (millions) | Original Bad Debt/ Revenue | Restated Bad Debt/ Revenue | Original Net Income (millions) | Restated Net Income/ Loss (millions) | Difference in Net Income/ Loss |
|---|---|---|---|---|---|---|---|---|---|---|
| FY 2012 | $968.2 | $943.4 | (2.6%) | $73.7 | $52.8 | 7.6% | 5.6% | $123.4 | $121.1 | (1.9%) |
| 1Q 2013 | $222.0 | $213.0 | (4.1%) | $18.3 | $13.0 | 8.2% | 6.1% | $27.0 | $24.7 | (8.5%) |
| 2Q 2013 | $197.6 | $193.4 | (2.1%) | $18.6 | $11.4 | 9.4% | 5.9% | $10.4 | $12.1 | 16.3% |
| 3Q 2013 | $185.6 | $182.8 | (1.5%) | $16.8 | $7.3 | 9.0% | 4.0% | $10.1 | $14.2 | 40.6% |
| 4Q 2013 | $163.5 | $162.2 | (0.8%) | $18.7 | $15.4 | 11.4% | 9.5% | ($6.5) | ($5.1) | (21.5%) |
| FY 2013 | $768.6 | $751.4 | (2.2%) | $72.3 | $47.1 | 9.4% | 6.3% | $41.0 | $45.9 | 12.0% |

(*Id.* ¶ 43; MTD Mem. 6, ECF No. 58–1; Manolova Decl. Ex. E at 32–33, ECF No. 28–2 at 39–40.) [1]

1. This table is based on Plaintiffs' allegations in addition to documents submitted as Exhibits to the Manolova Declaration in Defendants' first Motion to Dismiss and Request for Judicial Notice, (ECF No. 28), which the Court granted in its entirety, (*see* ECF No. 53).

On July 25, 2014, Defendant Bridgepoint disclosed that the SEC was investigating its accounting practices, including revenue recognition and receivables. (*Id.* ¶ 134.) The SEC also issued a subpoena for the revised and restated time periods, and documents and information dating back to July 1, 2009 to the present. (*Id.*) On July 12, 2016, via a Form 8–K filed with the SEC, Defendant Bridgepoint announced that the Department of Education would commence a review of Ashford's administration of federal student financial aid programs for certain students identified in the 2009–2012 calendar year. (*Id.* ¶ 136.) In this same Form 8–K, Defendant Bridgepoint also announced that the U.S. Department of Justice was conducting an "investigation concerning allegations that the Company may have misstated Title IV refund revenue or overstated revenue associated with private secondary loan programs and thereby misrepresented its compliance with the 90/10 rule of the Higher Education Act." (*Id.* ¶ 137.)

### III. Procedural Background

Lead Plaintiff Zamir filed an initial complaint on February 24, 2015, alleging two causes of action for violation of Section 10(b) of the Exchange Act and Rule 10b–5 and violation of Section 20(a) of the Exchange Act. (*See generally* ECF No. 1.) Lead Plaintiffs moved for appointment as lead plaintiffs and approval of choice of counsel on April 27, 2015. (*See* ECF No. 3.) Because the motion was unopposed, (*see* ECF No. 13), the Court granted Lead Plaintiffs' motion, (*see* ECF No. 14).

On September 18, 2015, Lead Plaintiffs filed the AC, asserting the same causes of action as in the original complaint. (*See* ECF No. 17.) Several Defendants filed motions to dismiss on November 24, 2015, (*see* ECF Nos. 28, 30), and on January 11, 2016, Lead Plaintiffs filed a Motion to Strike, (*see* ECF No. 37). The Court granted Defendants' motions to dismiss, and

denied Lead Plaintiffs' Motion to Strike. ("First MTD Order," ECF No. 53.) Thereafter Lead Plaintiffs dismissed several named Defendants. (ECF Nos. 56, 59.) Lead Plaintiffs filed their SAC on September 9, 2016. (ECF No. 57.) Defendants filed the instant Motion to Dismiss on October 24, 2016.

### MOTION TO DISMISS

### I. Legal Standard

Federal Rule of Civil Procedure 12(b)(6) permits a party to raise by motion the defense that the complaint "fail[s] to state a claim upon which relief can be granted," generally referred to as a motion to dismiss. The Court evaluates whether a complaint states a cognizable legal theory and sufficient facts in light of Federal Rule of Civil Procedure 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Although Rule 8 "does not require 'detailed factual allegations,' .... it [does] demand more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). In other words, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)). A complaint will not suffice "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 677, 129 S.Ct. 1937 (citing *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955).

In order to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim

to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955); *see also* Fed. R. Civ. P. 12(b)(6). A claim is facially plausible when the facts pled "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 677, 129 S.Ct. 1937 (citing *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). That is not to say that the claim must be probable, but there must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* Facts "'merely consistent with' a defendant's liability" fall short of a plausible entitlement to relief. *Id.* (quoting *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955). Further, the Court need not accept as true "legal conclusions" contained in the complaint. *Id.* This review requires context-specific analysis involving the Court's "judicial experience and common sense." *Id.* at 678, 129 S.Ct. 1937 (citation omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.*

Where a complaint does not survive 12(b)(6) analysis, the Court will grant leave to amend unless it determines that no modified contention "consistent with the challenged pleading ... [will] cure the deficiency." *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)).

■ "Claims brought under Rule 10b–5 ... must meet Federal Rule of Civil Procedure 9(b)'s particularity requirement that '[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.'" *In re Dura Pharm., Inc. Sec. Litig.*, 452 F.Supp.2d 1005, 1016 (S.D. Cal. 2006) (alteration in original) (quoting Fed. R.

Civ. P. 9(b)) (citing *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1014 (9th Cir. 2005), *cert. denied*, 546 U.S. 1172, 126 S.Ct. 1335, 164 L.Ed.2d 51 (2006); *Yourish v. Cal. Amplifier*, 191 F.3d 983, 993 (9th Cir. 1999)). "In addition, in 1995, Congress enacted the Private Securities Litigation Reform Act of 1995 (PSLRA) and altered the pleading requirements in private securities fraud litigation by requiring a complaint plead with particularity both falsity and scienter." *Id.* at 1016–17 (quoting *Daou Sys.*, 411 F.3d at 1014) (internal quotation marks omitted).

## II. Analysis

As before, Lead Plaintiffs assert two causes of action: (1) violation of Section 10(b) of the Exchange Act and Rule 10b–5 against all Defendants, and (2) violation of Section 20(a) of the Exchange Act against Defendants Clark and Devine (collectively, the "Individual Defendants"). (*See generally* SAC, ECF No. 57.) Defendants ask the Court to dismiss Lead Plaintiffs' SAC with prejudice. (*See* MTD Mem. 18, ECF No. 58–1.)

### A. Section 10(b) and Rule 10b–5

■ "Section 10(b) of the Securities Exchange Act of 1934 forbids (1) the 'use or employ[ment] ... of any ... deceptive device,' (2) 'in connection with the purchase or sale of any security,' and (3) 'in contravention of' Securities and Exchange Commission 'rules and regulations.'" *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) (quoting 15 U.S.C. § 78j(b)). "Commission Rule 10b–5 forbids, among other things, the making of any 'untrue statement of a material fact' or the omission of any material fact 'necessary in order to make the statements made ... not misleading.'" *Id.* (quoting 17 CFR § 240.10b–5 (2004)). "The basic elements of a Rule 10b–5 claim,

therefore, are: (1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss.". *Daou · Sys.*, 411 F.3d at 1014 (citing *Dura Pharms.*, 544 U.S. at 341–42, 125 S.Ct. 1627). Defendants challenge the adequacy of Lead Plaintiffs' allegations concerning only the second and fourth elements. (*See generally* MTD Mem., ECF No. 58–1; *see also* Opp'n 1, ECF No. 61; Reply 4–9, ECF No. 63.)

### 1. Scienter

■■■ A private securities plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The "required state of mind" is "scienter," i.e., "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 975 (9th Cir. 1999), *abrogated on other grounds by S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008); *In re Peerless Sys., Corp. Sec. Litig.*, 182 F.Supp.2d 982, 987–88 (S.D. Cal. 2002). "[T]he PSLRA requires plaintiffs to plead, at a minimum, particular facts giving rise to a strong inference of deliberate or conscious recklessness." *Silicon Graphics*, 183 F.3d at 979; *In re Wet Seal, Inc. Sec. Litig.*, 518 F.Supp.2d 1148, 1157 (C.D. Cal. 2007). Recklessness amounts to " 'an extreme departure from the standards of ordinary care, and ... presents a danger of misleading buyers and sellers that is either known to the defendant or is so obvious

that the actor must have been aware of it.' " *DSAM Global · Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 389 (9th Cir. 2002) · (quoting *Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990)). To satisfy this pleading requirement, "the complaint must contain allegations of specific 'contemporaneous statements or conditions' that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001); *In re Levi Strauss & Co. Sec. Litig.*, 527 F.Supp.2d 965, 988 (N.D. Cal. 2007). The Court must consider competing inferences that could be drawn in favor of plaintiffs or defendants and determine whether plaintiffs have pled a "strong inference" of scienter which is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007).

Defendants argue that Lead Plaintiffs once again fail to adequately plead scienter. (MTD Mem. 4–13, ECF No. 58–1.) The Court agrees.[2]

#### a. GAAP[3] Violations

Lead Plaintiffs structure their opposition by responding to the directive of the Court's First MTD Order. (*See generally* Opp'n, ECF No. 61.) Specifically, the Court concluded that

[a]t the very least, the plaintiff must present facts demonstrating that the defendant was aware of the relevant GAAP principle and that this defendant knew how that princip[le] was being interpreted. The plaintiff must then plead

---

**2.** Although the Court addresses a number of Lead Plaintiffs' allegations individually, "it is cognizant of the duty to conduct a holistic analysis of Plaintiffs' scienter allegations. The flaws of the various allegations must be exposed as part of the Court's holistic analysis." *Westley v. Oclaro, Inc.*, No. C-11-2448 EMC,

2013 WL 2384244, at *5 (N.D. Cal. May 30, 2013).

**3.** Generally Accepted Accounting Principles ("GAAP"). *See, e.g., Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1056 (9th Cir. 2008).

facts explaining how the defendant's incorrect interpretation was so unreasonable or obviously wrong that it should give rise to an inference of deliberate wrongdoing.

(First MTD Order 13–14 (quoting *In re Medicis Pharm. Corp. Sec. Litig.*, No. CV-08-1821-PHX-GMS, 2010 WL 3154863, at *5 (D. Ariz. Aug. 9, 2010) (citing *Medicis*, 689 F.Supp.2d 1192, 1204 (D.Ariz. 2009))).) Lead Plaintiffs argue that their allegations in the SAC are sufficient to demonstrate that Defendants were deliberately reckless. (Opp'n 7, ECF No. 61.) Specifically, Lead Plaintiffs argue that at least three different events "necessitated Defendants' review, and thus, awareness of Defendant Bridgepoint's collectability assurance assessment. Based on the facts alleged in the SAC, Defendants' failure to review this policy during or after any of these three events amounts to deliberate recklessness." (*Id.*)

■ First, Lead Plaintiffs argue that Defendants Devine and Clark were made aware that: (1) under GAAP and SEC guidance, revenue cannot be recognized until collectibility is reasonably assured (*see* ¶ 41); (2) Bridgepoint undertook an assessment of whether the collectibility of its revenue was reasonably assured (¶ 45) and (3) Bridgepoint's collectibility assurance assessment did not take into consideration a student's ability to pay (*see* ¶ 45) by, at the latest, January 10, 2014, when Defendant Devine responded to an earlier SEC comment.

(*Id.* at 7.) Thus, "Defendants Clark and Devine were put on notice when the SEC raised the issue." (*Id.* at 7–8.)

■ Second, Lead Plaintiffs argue that on an earnings call on March 12, 2013, Defendants Clark and Devine, by "assur-

ing investors and analysts that they knew why the Bad Debt Percentage increased, [they] implicitly admitted that they knew how Bridgepoint accounted for both revenues and bad debt expenses ... [which] in turn necessitated an understanding of Bridgepoint's revenue recognition policy and the Company's collectability assurance as part of that policy." (*Id.* at 8.)

Third, Lead Plaintiffs similarly argue that Defendant Devine's announcement accompanying their amended Form 10–K that Defendant Bridgepoint would, among other things, focus on "improvements in the accounting process" would have "necessitated a review of Bridgepoint's revenue recognition policy and the Company's collectability assurance assessment." (*Id.* at 9.)

As to the first "event," the Court agrees with Defendants that "being 'put on notice' in this context simply means an awareness that there was an issue, with the January 10, 2014 letter to the SEC articulating Bridgepoint's position on that issue." (Reply 5, ECF No. 63.) This does not establish the requisite scienter.

That said, the Court is convinced that the other two events plausibly demonstrate that Defendant Devine was "aware of the relevant GAAP principle and that this defendant knew how that princip[le] was being interpreted." *In re Medicis Pharm. Corp. Sec. Litig.*, 2010 WL 3154863, at *5. Specifically, these events strongly suggest that Defendant Devine's admissions and remediation plan demonstrated an understanding of the underlying GAAP principle and how it was applied by Defendant Bridgepoint.[4] *See, e.g., id.* at *6 ("Plaintiffs allege that Medicis executives, in particular Peterson and Prygocki, emphasized the importance of the Company's return methodology and stated that the

---

4. Defendants appear to concede as much. *See, e.g.,* (Reply 6, ECF No. 63 ("While obviously at least (CFO) Devine knew Bridgepoint's rev-

enue recognition policy as it pertained to the independent students....").)

Company was not 'booking revenue in advance of future quarters.' "); *cf. Reese v. Malone*, 747 F.3d 557, 571 (9th Cir. 2014) ("In the wake of a crisis that has the potential to repeat itself, Johnson had every reason to review the results of BP–Alaska's corrosion monitoring to understand what happened, as well as to assess the possibility of future leaks in similar pipelines. Evidence of high levels of corrosion would be central to this inquiry."). However, the Court agrees with Defendants that Lead Plaintiffs do not identify any specific allegations against Defendant Clark. (*See* Reply 6 n.7, ECF No. 63.)

■ But awareness is not enough. Even if these three "events" adequately demonstrated that Defendants were aware of a particular GAAP principle and how it was being interpreted, Lead Plaintiffs must also plead facts explaining how Defendants' "incorrect interpretation was so unreasonable or obviously wrong that it should give rise to an inference of deliberate wrongdoing." *In re Medicis Pharm. Corp. Sec. Litig.*, 2010 WL 3154863, at *5. Lead Plaintiffs fail to do so.

Lead Plaintiffs argue that (1) "Bridgepoint's collectiblity assurance assessment was unreasonable and obviously wrong on its face" and "something that a non-accountant, like Defendant Clark, could understand," (Opp'n 10, ECF No. 61); (2) Defendants knew that independent paying students were less likely to pay tuition, (*id.* at 11); (3) anyone working in the for-profit education sector would have known that these students would have trouble paying tuition without financial aid, (*id.*); (4) Defendants were put on notice that the government would not be paying tuition for a significant number of students, (*id.* at 12); and (5) Defendants knew that a significant number of students left Bridgepoint mid-

course, including new allegations of a confidential witness explaining, among other things, that the Individual Defendants looked at numbers used to assess when a student was likely to leave Bridgepoint, (*id.* at 12).

■ As before, the Court concludes that these allegations fail to give rise to an inference—much less a strong inference—of deliberate wrongdoing. The "GAAP is not the lucid or encyclopedic set of preexisting rules that [Lead Plaintiffs] might perceive it to be." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 101, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995). "There are 19 different GAAP sources, any number of which might present conflicting treatments of a particular accounting question." *Id.* (citing Robert S. Kay & D. Gerald Searfoss, Handbook of Accounting and Auditing: 1994 Update With Cumulative Index, ch. 5, at 6–7 (2d ed. 1993)). Consequently, GAAP "tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management." *Thor Power Tool Co. v. Comm'r of Internal Revenue*, 439 U.S. 522, 544, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979). The Ninth Circuit therefore recognizes that "the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter." *DSAM*, 288 F.3d at 390 (quoting *In re Software Toolworks, Inc.*, 50 F.3d 615, 627 (9th Cir. 1994)). Violations of GAAP, "even significant ones or ones requiring large or multiple restatements, must be augmented by other specific allegations that defendants possessed the requisite mental state." *In re Int'l Rectifier Corp. Sec. Litig.*, No. CV07-02544-JFWVBKX, 2008 WL 4555794, at *13 (C.D. Cal. May 23, 2008) (collecting cases).

■ Lead Plaintiffs' identified allegations[5] do not alter the Court's previous

---

5. This includes Lead Plaintiffs' reliance on a confidential witness ("CW1") who stated, for

example, that Bridgepoint was tracking student retention and that these data were avail-

analysis. In fact, the crux of Lead Plaintiffs' GAAP· identified allegations remains the·same from the AC: Defendants "knew or recklessly disregarded the necessity to reassess whether collectability was reasonably assured on a student-by-student basis when recognizing revenue subsequent to a student's initial enrollment with Bridgepoint's institutions upon a change in facts or circumstances that would affect a student's ability to pay, in violation of GAAP." (AC ¶ 90, ECF No. 17; *see also* SAC ¶ 5, ECF No. 57 ("Defendants knew or recklessly disregarded that the collectibility of this revenue was not reasonably assured.").)

■ As before, "[t]he [S]AC does not allege that [Bridgepoint]'s external auditors counseled against the practice or·that [any of the Individual Defendants] admitted or was aware it was improper." *Metzler*, 540 F.3d· at 1069.[6] Instead, Lead Plaintiffs again emphasize the obviousness of the violations. (*Compare* Opp'n 10, ECF No. 61, *with* MTD Opp'n 20–21, ECF No. 36.) Specifically, Lead Plaintiffs allege that

> Defendants were at a minimum deliberately reckless in basing the assurance of collectibility of its revenues on the government, military, or corporations when Bridgepoint did not ultimately derive

100% of its revenue from these parties. Additionally, during the Class Period, when Defendants. knew key facts indicating that significant amount of revenue due from students was not reasonably assured to be collectible, it was at minimum,· extremely reckless for Defendants to continue to base· their revenue recognition collectibility assurance off of the government's ability to pay.

(SAC ¶ 75, ECF No. 57.)

■ This is again insufficient. "A plaintiff . . . cannot merely. point at a GAAP principle and contend that a correct interpretation was simple or obvious." *Medicis Pharm.*, 2010 WL 3154863, at *5. And, as in *Metzler*, "[a]lthough the [S]AC does draw its own legal conclusion that the practice was improper, . . . the [S]AC's factual allegations point only to disagreement and questioning . . . about the practice." *See* 540 F.3d at 1069.· Furthermore, Defendants again persuasively argue that Lead Plaintiffs fail to plausibly allege that Mr. Clark "had any knowledge of, or involvement with, the accounting for the independent paying students," (MTD Mem. 8, ECF No. 58–1), much less that Mr. Clark, a non-accountant, "would have an informed opinion as to whether treating the independent paying·students as pre-

---

·able to Defendants Clark and Devine. (*See, e.g.*; SAC ¶ 60, ECF No. 57.) CW1 also "commented that it felt kind of cool to know that the CEO and CFO were looking at the numbers [he/she] provided." (*Id.*) But "corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management *and· related to fraud.*" *Metzler*, 540 F.3d at 1068 (emphasis added). *See also In re Maxwell Techs., Inc. Sec. Litig.*, 18 F.Supp.3d 1023, 1041 (S.D. Cal. 2014) (holding that "[a]lthough Plaintiff has alleged that the individual defendants attended sales-related meetings and *had access to* sales reports, this does not support the inference that the individual defendants *must*

*have known about the accounting misconduct*" (emphases added)). Lead Plaintiffs fail to provide these additional allegations.

6. The Court does not, as Lead Plaintiffs caution, "adopt a rule that in all accounting cases where a clean audit opinion is issued, the plaintiff must allege that the defendants withheld information from the auditor or that the auditor committed· fraud or serious error." (Opp'n 16, ECF No. 61.) And the Court agrees with Lead Plaintiffs that an audit opinion "does not, *standing alone*, negate any otherwise compelling inference of scienter plaintiffs' pleading raises." *Okla. Firefighters Pension & Ret. Sys. v. IXIA*, 50 F.Supp.3d ˌ1328, 1365 n.183 (C.D. Cal. 2014) (emphasis added).

senting a revenue recognition issue, versus a bad debt issue, was the only correct decision under GAAP," (*id.*). Lead Plaintiffs' allegations against Mr. Devine fare no better, since, as before, the SAC details a back-and-forth over the appropriate accounting treatment between Mr. Devine and the SEC, (*See* SAC ¶¶ 45–48, 63–65, ECF No. 57), plausibly "suggesting that there was room for reasonable people to disagree over this issue," (MTD Mem. 9, ECF No. 58–1).[7] *See In re Nuko Info. Sys. Sec. Litig.*, 199 F.R.D. 338, 344 (N.D. Cal. 2000) ("[I]t is well established that GAAP violations, without more, do not establish scienter, even if those GAAP violations were deliberate." (citing *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir. 1994))); *In re REMEC Inc. Sec. Litig.*, 702 F.Supp.2d 1202, 1243 (S.D. Cal. 2010) ("[E]ven deliberate GAAP violations do not by themselves establish scienter." (internal citation omitted)). As before, Lead Plaintiffs' allegations concerning the GAAP violations do not lead to an inference of scienter as compelling as the inference raised by Defendants. (*See* MTD Mem. 10, ECF No. 58–1 ("It is not as through Bridgepoint completely ignored the fact that the independent paying students were less likely to fulfill their contractual obligations to Bridgepoint— Bridgepoint just dealt with that issue by raising its levels of bad debt. Although a restatement involves an admission that the accounting treatment was incorrect, in the abstract treating the independent paying students as presenting a bad debt issue does not seem so odd or ignorant that the only plausible answer is fraud.").)

 With regard to restatements, "[i]n general, the mere publication of a restatement is not enough to create a strong inference of scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000 (9th Cir. 2009), *as amended* (Feb. 10, 2009). The Ninth Circuit does recognize two "narrow" exceptions to this general rule, however. *Id.* (citing *S. Ferry*, 542 F.3d at 785).

> The first exception permits general allegations about "management's role in a corporate structure and the importance of the corporate information about which management made false or misleading statements" to create a strong inference of scienter when these allegations are buttressed with "detailed and specific allegations about management's exposure to factual information within the company."

*Id.* (quoting *S. Ferry*, 542 F.3d at 785). "The second exception ... permits an inference of scienter where the information misrepresented is readily apparent to the defendant corporation's senior management," i.e., "where the falsity is patently obvious—where the facts [are] prominent enough that it would be absurd to suggest that top management was unaware of them." *Id.* at 1001 (quoting *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 989 (9th Cir. 2008)) (internal quotation marks omitted).

Lead Plaintiffs' allegations satisfy neither of these exceptions for many of the same reasons discussed above. Moreover, the restated revenue for fiscal year 2013 differed by only 2.2%. (*See* SAC ¶ 43, ECF No. 17; *see also* MTD Mem. 7, ECF No. 58–1.) "When restatements have been considered evidence of scienter, the restatements were of considerably greater magnitude than those here." *See In re Aspeon, Inc. Sec. Litig.*, 168 Fed.Appx. 836, 839

---

7. The Court agrees with Lead Plaintiffs that, compared to the AC, the SAC compresses the dialogue between the SEC and Defendant Devine. But the SAC still alleges a conversation between the SEC and Defendant Devine regarding Devine's explanation as to "how the financial aid processing issue affected the Bad Debt Percentage." (SAC ¶ 65, ECF No. 57.)

(9th Cir. 2006) (affirming district court's dismissal of § 10(b) claim where restatement "only demonstrated a revenue reduction of 1.57%" and therefore failed to "give rise to a strong inference the original statements were issued with deliberate or conscious recklessness").

Accordingly, Lead Plaintiffs' allegations concerning Defendants' GAAP violations and restatement of Defendant Bridgepoint's financials fail to establish a strong inference of scienter.

### b. Sarbanes–Oxley Certifications and Internal Control Deficiencies

▮ Defendants argue that Lead Plaintiffs' allegations with respect to the contents of the Individual Defendants' Sarbanes–Oxley certifications in the SAC are largely identical to those alleged in the AC, (MTD Mem. 11, ECF No. 58–1 (comparing SAC ¶¶ 113–15, with AC ¶¶ 109–111)), which the Court found insufficient in its previous Order. (First MTD Order 19, ECF No. 53.) Lead Plaintiffs concede that these certifications alone do not add to the inference of scienter, but "may provide additional evidence of scienter if the certifications were false and misleading and the defendant knew that, or was deliberately reckless in issuing the certifications." (Opp'n 13, ECF No. 61 (citing *Stocke v. Shuffle Master, Inc.*, 615 F.Supp.2d 1180, 1190 (D. Nev. 2009)).)

▮ With respect to the false Sarbanes–Oxley certifications, "Sarbanes–Oxley certifications are not sufficient, without more, to raise a strong inference of scienter." *Zucco Partners*, 552 F.3d at 1004 (quoting *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 747–48 (9th Cir. 2008)). Moreover, "required certifications under Sarbanes–Oxley ... add nothing substantial to the scienter calculus ... and do not make ... otherwise insufficient allegations more compelling by their presence in the same complaint." *Id.* at 1003–04. As before, the Court gives no weight to Lead Plaintiffs' allegations concerning Defendants' false Sarbanes–Oxley certifications either individually or in the Court's holistic analysis. *See infra* Part II.A.1.e.

### c. Government Investigations

Lead Plaintiffs argue that the "investigations being conducted by the SEC, Department of Education, and Department of Justice all further support an inference of scienter." (Opp'n 14, ECF No. 61.) The Court therefore considers Lead Plaintiffs' allegations concerning these government investigations as part of the Court's holistic analysis. *See infra* Part II.A.1.e.

### d. Holistic Analysis

▮ Although none of Lead Plaintiffs' individual allegations concerning Defendants' scienter is availing, the Court must also "review 'all the allegations holistically.'" *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48, 131 S.Ct. 1309, 179 L.Ed.2d 398 (2011) (citing *Tellabs*, 551 U.S. at 326, 127 S.Ct. 2499). "The inquiry ... is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 322–23, 127 S.Ct. 2499 (emphasis in original).

▮ Even viewed holistically, however, Lead Plaintiffs' allegations again do not give rise to a strong inference of scienter that is at least as compelling as an inference of nonfraudulent conduct. And the Court notes that it conducts its holistic analysis this time around without Lead Plaintiffs' allegations of insider trading, (*see* First MTD Order 16–19, ECF No. 53), which Lead Plaintiffs removed from their SAC, (*see generally* SAC, ECF No. 57). As before, the SAC does not support an inference of scienter "that is greater than the sum of its parts." *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1165 (9th Cir. 2009) (citing *S. Ferry*, 542 F.3d at 784; *Metzler*, 540 F.3d at 1049). The Court

therefore **GRANTS** Defendants' MTD (ECF No. 58) and **DISMISSES WITHOUT PREJUDICE** Lead Plaintiffs' first cause of action.

### 2. Loss Causation

To demonstrate loss causation, a plaintiff must allege "a causal connection between the material misrepresentation and the loss." 15 U.S.C. § 78u–4(b)(4); *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). In other words, "the complaint must allege that the practices that the plaintiff contends are fraudulent were revealed to the market and caused the resulting losses." *Metzler*, 540 F.3d at 1061. A corrective disclosure must reveal some aspect of the alleged fraud to the market. *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005). Additionally, a plaintiff's allegations must reveal that "the defendant's 'share price fell significantly after the truth became known.'" *Metzler*, 540 F.3d at 1062 (quoting *Dura Pharm.*, 544 U.S. at 347, 125 S.Ct. 1627). The Ninth Circuit has recently clarified that the plaintiff must only allege "facts that, if taken as true, plausibly establish loss causation," *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008), "suggesting that loss causation is a fact-intensive inquiry better suited for determination at trial than at the pleading stage," *Rudolph v. UTStarcom*, No. C 07-04578 SI, 2008 WL 4002855, at *4 (N.D. Cal. Aug. 21, 2008) (citing *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 427 n.4 (3rd Cir. 2007); *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)). Rule 9(b)'s heightened pleading standard applies to allegations of loss causation. *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014).

As before, Lead Plaintiffs point to the following partial corrective disclosures to argue that the alleged fraud was revealed to the market: (1) the March 11, 2014 press release preliminarily announcing Defendant Bridgepoint's fourth quarter and 2013 fiscal year results and subsequent earnings call, (SAC ¶¶ 12, 120, 123, ECF No. 57); (2) the May 12, 2014 press release disclosing, among other things, the SEC's inquiry and Defendant Bridgepoint's evaluation of whether a restatement of its 2011 through 2013 financial results was necessary, as well as the earnings conference call held that same day, (*id.* ¶¶ 124–127); and (3) the May 30, 2014 8–K revealing Defendant Bridgepoint's conclusion that there were material misstatements of revenue and bad debt expense as well as material weaknesses over financial reporting, and also providing an estimate of the restated revenue and expenses for the 2013 fiscal year, (*id.* ¶¶ 128–29). (*See* Opp'n 18–19, ECF No. 61.) Defendants "are cognizant of the Court's Order finding Plaintiffs' prior loss causation allegations to be sufficient," but argue that these three partial disclosure dates fail to adequately plead loss causation. (Reply 9, ECF No. 63.)

The Court again concludes that Lead Plaintiffs' allegations could plausibly establish loss causation. *See Gilead Scis.*, 536 F.3d at 1057; *see also Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016) (reversing district court's holding that plaintiff had not adequately pled loss causation where defendant's stock price dropped over 20% following announcement of SEC subpoena but "the market reacted hardly at all" to later disclosure revealing falsity of previous representations). Accordingly, the Court declines to grant Defendants' MTD on this alternative ground at this time.

### B. Section 20(a)

"Section 20(a) of the Act makes certain 'controlling' individuals also

liable for violations of section 10(b) and its underlying regulations." *Zucco Partners*, 552 F.3d at 990. Specifically, Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 78u(d) of this title), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). "Thus, a defendant employee of a corporation who has violated the securities laws will be jointly and severally liable to the plaintiff, as long as the plaintiff demonstrates 'a primary violation of federal securities law' and that 'the defendant exercised actual power or control over the primary violator.'" *Zucco Partners*, 552 F.3d at 990 (quoting *No. 84 Employer–Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003)) (citing *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996)). "Section 20(a) claims may be dismissed summarily ... if a plaintiff fails to adequately plead a primary violation of section 10(b)." *Id.* (citing *In re VeriFone Sec. Litig.*, 11 F.3d 865, 872 (9th Cir. 1993); *In re Metawave Commc'ns Corp. Sec. Litig.*, 298 F.Supp.2d 1056, 1087 (W.D. Wash. 2003)).

Because the Court has dismissed Lead Plaintiffs' cause of action predicated upon violations of Section 10(b), *see supra* Part II.A, the Court **GRANTS** Defendants' MTD and **DISMISSES WITHOUT PREJUDICE** Lead Plaintiffs' second cause of action against the Individual Defendants for violations of Section 20(a).

## CONCLUSION

In light of the foregoing, the Court **GRANTS** Defendants' MTD (ECF No. 58). While the Court entertains doubts concerning Lead Plaintiffs' ability to adequately re-plead scienter, the Court will grant Lead Plaintiffs another opportunity to amend. Accordingly, the Court **DISMISSES WITHOUT PREJUDICE** Lead Plaintiffs' SAC. (ECF No. 57.) Lead Plaintiffs **MAY FILE** a third amended complaint (TAC) within fourteen (14) days of the date on which this Order is electronically docketed. *Failure to file a TAC by this date may result in dismissal of this action with prejudice.*

**IT IS SO ORDERED.**